# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BARDY DIAGNOSTICS, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff/ Counterclaim Defendant, | ) ) ) ) | |
| v. | ) ) | **C.A. No. 2021-0175-JRS** |
| HILL-ROM, INC., an Indiana corporation, and BARCELONA MERGER SUB, INC., a Delaware corporation, | ) ) ) ) ) | |
| Defendants/ Counterclaim Plaintiffs. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted:  June 4, 2021
Date Decided:  July 9, 2021

Brad D. Sorrels, Esquire, Andrew D. Cordo, Esquire, Jessica A. Hartwell, Esquire, Lindsay K. Faccenda, Esquire, Benjamin M. Potts, Esquire, Nora M. Crawford, Esquire and Jeremy W. Gagas, Esquire of Wilson Sonsini Goodrich & Rosati P.C., Wilmington, Delaware and David J. Berger, Esquire and Steven Guggenheim, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California, Attorneys for Plaintiff/Counterclaim Defendant Bardy Diagnostics, Inc.

Michael A. Pittenger, Esquire, T. Brad Davey, Esquire, Matthew F. Davis, Esquire and Aaron R. Sims, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Richard T. Marooney, Esquire, Alvin Lee, Esquire, Kenneth Fowler, Esquire, Julia Barrett, Esquire and Matthew Bush, Esquire of King & Spalding LLP, New York, New York, Attorneys for Defendants/Counterclaim Plaintiffs Hill-Rom, Inc. and Barcelona Merger Sub, Inc.

**SLIGHTS, Vice Chancellor**

Hill-Rom, Inc. ("Hillrom") and its merger subsidiary, Barcelona Merger Sub, Inc. ("Merger Sub"), committed in an Agreement and Plan of Merger (the "Agreement") to acquire Bardy Diagnostics, Inc. ("Bardy" or the "Company"), a medical device startup, by merger (the "Merger").[1]  After the parties signed the Agreement, but before closing, the Medicare program, through an authorized agent, announced that the rates Medicare would pay for Bardy's signature medical device would be dramatically reduced.  Soon after, Hillrom gave notice to Bardy that it would not close the Merger.  According to Hillrom, it was excused from closing because, between signing and closing, Bardy suffered a Material Adverse Effect ("MAE") as defined in the Agreement.  This litigation followed.

The usual refrain from sellers in "busted deal" cases is that the buyer developed an acute case of "buyer's remorse" after signing and then sought to exploit contractual exits to avoid closing.[2]  The court often joins the "buyer's remorse" chorus when it sees evidence that the buyer actually worked, through deliberate

---

[1] I refer throughout this Opinion to "Hillrom" in the singular, as Merger Sub is a shell entity created by Hillrom solely to effectuate the transaction.

[2] *See, e.g.*, *Snow Phipps Gp., LLC v. Kcake Acq., Inc.*, 2021 WL 1714202, at *12 (Del. Ch. Apr. 30, 2021) (noting the buyer suffered from "buyer's remorse"); *Hexion Specialty Chems., Inc. v. Hunstman Corp.*, 965 A.2d 715, 721–36 (Del. Ch. 2008) (same).

indolence or sabotage, to facilitate the demise of the transaction so that it could avoid the deal it struck.[3] This case is different.

In January 2020, Hillrom, a publicly-held, global medical technology company, expressed interest in acquiring Bardy, a startup medical device company that, then and now, had a single product offering on the market: a long-term ambulatory electrocardiogram ("AECG") device (known alternatively as a long-term Holter device, or "LTH") called the Carnation Ambulatory Monitor ("CAM") patch. The CAM patch is a single-use, bandage-size patch designed to be secured to a patient's chest and worn for up to 14 days, during which it records electrocardiographic data to detect heart arrhythmias. That data is received by Bardy via the cloud (where it is also stored) and then interpreted at one of Bardy's independent diagnostic testing facilities ("IDTF") by trained ECG technicians who create a proprietary report for review by the patient's physician. More comfortable and accurate than comparable devices, Bardy's best-in-class technology fueled the Company's explosive growth, and Hillrom came to view Bardy as an inorganic way to enter the fast-growing extended AECG device market.

---

[3] *See Snow Phipps*, 2021 WL 1714202, at *12 (concluding the record showed the acquirer "set on a course of conduct predestined to derail Debt Financing and supply a basis for terminating the agreements."); *Hexion*, 965 A.2d at 721–36 (observing that, following the seller's disappointing quarterly results, the buyer curated a contrived insolvency opinion based on overly pessimistic inputs to dissuade lenders from financing the acquisition).

Bardy operated under several revenue models to monetize the CAM patch, with its largest tied to servicing Medicare patients. Medicare sets its rates for reimbursement of medical devices and related services through use of Current Procedural Technology ("CPT") codes. The Centers for Medicare & Medicaid Services ("CMS"), an arm of the federal Department of Health and Human Services, develops and administers Medicare's reimbursement policy, overseeing adoption and pricing of CPT codes for medical services. In certain situations, however, CMS assigns Temporary Category III CPT codes to new services and then delegates pricing authority to local Medicare Administrative Contractors ("MACs")—private entities operating within designated regions and vested with authority to set pricing for certain CPT codes.

Though prices set by MACs operate with the same legal force as those set by CMS, the means and methods by which MACs arrive at their pricing decisions is— unlike CMS—notoriously opaque. The reimbursement rates attached to the temporary CPT codes assigned to the CAM patch have always been set by a MAC, Novitas Solutions, Inc. ("Novitas"), which for years consistently priced the device at around $365 per patch.

As Hillrom and Bardy began their negotiations in early 2020, both parties understood that CMS was expected to set a permanent national rate for the CAM patch's CPT codes, and both expected the rate to be higher than the rate Novitas had

3

previously set. The designation of a national rate for extended AECG devices was viewed as a positive development for those operating in the AECG space, not only because the reimbursement rate was likely to increase but also because the permanent CPT codes would signal to prescribing physicians that the devices had matured into the "standard of care" for the diagnosis of cardiac arrythmias.

To the surprise of Hillrom, Bardy and others in the AECG space, CMS elected not to set the anticipated higher reimbursement rates, or any reimbursement rate, for the CAM patch's CPT codes, delegating that authority (again) to the MACs. Hope was not lost, however, as Hillrom and Bardy both expected that, in the worst-case scenario, Novitas would set reimbursements for the CAM patch at historic rates.

Novitas had not yet issued its decision on pricing when, in early January 2021, Hillrom signed the Agreement to acquire Bardy. To shift the risk of any decline in revenue attributable to lower reimbursement rates onto Bardy, the Agreement contemplated an earnout regime that tied the ultimate purchase price to certain revenue targets, which were invariably affected by a change in the rate at which Bardy was reimbursed for its services by Medicare. The Agreement also contained an MAE clause, which excused Hillrom from its obligation to close if the Company experienced an MAE, as defined in the Agreement.

On January 29, Novitas announced a new rate (the "January Novitas Rate") for the CPT codes governing the CAM patch: $42.68 for Texas and $49.70 for

4

New Jersey (the sites of Bardy's two IDTFs). Novitas' drastic reduction in Medicare reimbursement rates came without warning and hit both Bardy and Hillrom like a Tyson right uppercut. The approximately 86% decline in the reimbursement rate was disorienting.[4] After the dust settled and everyone's eyes rolled back into place, the parties agreed to operate on the premise that Novitas had made a mistake. Industry players, including Bardy (with Hillrom's support), undertook a coordinated effort to educate Novitas on the error of its ways.

Novitas did not act with dispatch, however, and Hillrom's appetite to close on the Merger soured as hope for a Novitas correction waned. On February 21, 2021, three days before the Merger was scheduled to close, Hillrom informed Bardy that it believed an MAE had occurred, thereby excusing its obligation to close. Bardy filed its Complaint a week later, on February 28, 2021, seeking specific performance of the Agreement and money damages for Hillrom's unexcused delay. Hillrom counterclaimed alleging that an MAE had occurred or, in the alternative, the purpose of the Agreement had been frustrated.

On April 10, 2021, Novitas increased the January Novitas Rate by nearly three times, to roughly $133 (the "April Novitas Rate"), still less than half of the historic rate. Bardy remains optimistic that either Novitas or CMS will increase

---

[4] "Everyone has a plan until they get punched in the mouth." Mike Tyson.

reimbursement rates further. In the meantime, it maintains that its unit economics are strong and it continues to project record-breaking growth. For its part, Hillrom believes Bardy will run out of cash before it turns a profit. Thus, by Hillrom's lights, Bardy is either conjuring litigation-driven optimism or is unknowingly dancing in quicksand. Either way, Hillrom remains adamant that the April Novitas Rate was and is an MAE.

The matter was tried over the course of three days. After carefully considering the evidence, I am satisfied this is not a case of "buyer's remorse." Hillrom remained optimistic about Bardy's potential even after CMS and Novitas delivered disappointing news, and it stood ready to close if either Novitas or CMS restored reimbursement rates to historic levels. Rather than work to skuttle the deal, Hillrom encouraged Bardy's efforts to convince Novitas to change its mind. When that did not happen, Hillrom invoked contractual exits in good faith.

Of course, the fact Hillrom did not act in bad faith does not mean it has properly refused to close on the basis of the Agreement. Good faith does not excuse a breach of contract. After carefully considering the evidence, I am satisfied Hillrom did not carry its burden to prove that Bardy suffered an MAE given its failure to prove the durational significance of the April Novitas Rate. Even if an MAE occurred, the April Novitas Rate was carved out from the definition of MAE as a "Healthcare Law." Though the Agreement sets forth an exception to this carve-out

6

for events that disproportionately affect Bardy relative to similarly situated companies operating in the same industries, the preponderance of the evidence reveals the April Novitas Rate did not disproportionately impact Bardy. For the same reasons the Company did not suffer an MAE, Hillrom's invocation of the frustration of purpose doctrine is misplaced.

Given these factual findings, Bardy is entitled to specific performance and prejudgment interest on the deal price, but its claim for indemnification under the Agreement fails. My reasoning follows.

## I. BACKGROUND

The trial record comprises 824 trial exhibits,[5] live testimony from six fact and five expert witnesses,[6] deposition testimony from 13 fact and five expert witnesses[7] and 38 stipulations of fact.[8] The following are the facts proven by a preponderance of the credible, competent evidence, with the parties' respective burdens of proof in mind.

---

[5] D.I. 74.

[6] D.I. 68 (Joint Pre-Trial Stip. and Order) ("PTO") ¶¶ 49–52.

[7] D.I. 71–72.

[8] I cite to the joint trial exhibits as "JX __," the trial transcript as "Tr. __ (witness name)"; and depositions lodged as evidence as "(Name) Dep. __."

## A. The Parties

Plaintiff, Bardy, is a Delaware corporation that makes and sells AECG monitors and provides related diagnostic services. It operates IDTF facilities in Houston, Texas and New Providence, New Jersey.[9]

Defendant, Hillrom, is an Indiana corporation with its principal place of business in Chicago, Illinois.[10] Defendant, Merger Sub, is a Delaware corporation and a wholly-owned subsidiary of Hillrom.[11]

## B. Bardy's Business

In 2013, Gust Bardy, M.D., a cardiac electrophysiologist, founded Bardy to overcome challenges commonly faced in ambulatory cardiac monitoring ("ACM").[12] For Dr. Bardy, the Company was a labor of love formed in memory of his wife, who had passed away the year before from complications associated with poorly diagnosed cardiac rhythm disorders.[13]

---

[9] PTO ¶¶ 7, 9.

[10] PTO ¶ 10.

[11] PTO ¶ 12.

[12] PTO ¶ 8.

[13] Tr. 15:2–16:21 (Bardy); *see also* JX 62 at 7 (providing a picture of Dr. Bardy's wife captioned "[t]he reason the company was founded").

Bardy currently manufactures and markets a single product called the CAM patch, which belongs to a category of ACM products sometimes referred to as long-term ambulatory electrocardiogram (AECG) or long-term Holter (LTH) devices.[14] Bardy's CAM patch is a single-use, bandage-size patch designed to be affixed to a patient's chest and worn for up to 14 days,[15] during which it records electrocardiographic data.[16] That data is uploaded to Bardy via the cloud and read at one of Bardy's two IDTFs by trained ECG technicians who create a proprietary report for review by the patient's physician.[17]

Bardy's CAM patch is, by all accounts, exceptional.[18] Two separate head-to-head studies published in the American Heart Journal conclude that the CAM patch detects arrhythmias with accuracy superior to both traditional Holter monitors and other extended AECG monitors, including the monitor developed by Bardy's

---

[14] PTO ¶ 13; JX 396.

[15] PTO ¶ 13.

[16] JX 337 at 14–15; JX 386 at 2.

[17] PTO ¶ 13; JX 62 at 27–31, 72; JX 337 at 15.

[18] *See* JX 204 at 3 (Hillrom's Dr. Johannes de Bie noting, "I have little doubt that the [Bardy] solution (CAM+IDTF) is currently the clinically best solution for [extended AECG] for the diagnosis of infrequent arrhythmias and that it is not easy to copy."); *see also* (Blanchard) Dep. 46:3-11 (explaining that Dr. de Bie is Hillrom's "chief scientist expert, ECG person"); Tr. 36:11–38:14, 84:19–24 (Bardy) (agreeing with Dr. de Bie's assessment); *id.* at 104:2–17 (LaViolette) (same).

competitor, iRhythm Technologies, Inc. ("iRhythm"), called the "Zio XT" patch.[19]
AECG monitors like the CAM patch are also more patient-friendly, comfortable and inconspicuous than traditional Holter monitors.[20] Bardy has fortified its competitive moat with intellectual property; indeed, the CAM patch incorporates technology covered by 80 patents—more than the rest of the industry combined.[21]

Bardy is also developing several other products, including an insertable cardiac monitor ("ICM") it expects to bring to market in 2023.[22] An ICM is a device that is inserted below the skin in a patient's chest for continuous, long-term biometric monitoring.[23] Unlike current ICMs, Bardy's product will have a rechargeable battery, superior signal quality and enabled cloud-based analysis.[24] The ICM market is "a billion dollar category" with a reimbursement structure distinct from the CAM

---

[19] *See* JX 40 at 2; JX 54 at 4, 7; JX 62 at 15; JX 397 at 2.

[20] JX 509 at 4; JX 54 at 4. For example, unlike older technology, the CAM patch does not require lead wires or a recording device attached to a belt or lanyard, making for a more comfortable user experience. *See* PTO ¶ 13.

[21] Tr. 18:12–20:10 (Bardy); *see also* JX 204 at 3 (Hillrom's chief scientist expert observing that the CAM patch "is not easy to copy.").

[22] PTO ¶ 14; Tr. 32:1–2, 63:13–17 (Bardy); *id.* at 105:5–20, 105:21–106:9 (LaViolette).

[23] JX 331 at 16; JX 94 at 52–58.

[24] Tr. 29:5–31:11 (Bardy); *id.* at 105:5–20 (LaViolette); JX 62 at 42; JX 194.

patch.[25] Bardy is also developing next-generation patches that it hopes will allow it to serve different market segments at lower cost as "the only company in the world with the entire spectrum of monitoring technologies at [its] disposal."[26]

For now, the CAM patch comprises 100% of Bardy's revenue.[27] That revenue is principally derived from either of two models: "split billing" or "fee for service."[28]

## 1. Split Billing

Under the split billing model, Bardy provides the CAM patch to a physician for free, and the physician applies the patch to a patient.[29] The bill is then "split" into two components. In the "professional component," the physician bills the insurer for the application of the patch and the interpretation of Bardy's report.[30] In the "technical component," Bardy bills the insurer for the data analysis and preparation of the resulting report.[31] If a patient is insured under Medicare, then

---

[25] Tr. 105:23–106:9 (LaViolette); *see also* (Bardy) Dep. 174:13–175:2 (describing ICM potential to be "a much bigger business than our dermal monitoring business [*i.e.*, the CAM patch]").

[26] Tr. 32:3–15, 58:19–24 (Bardy).

[27] *See* (Bardy) Dep. 99:4–6, 242:19–21.

[28] Tr. 154:4–18 (Querry).

[29] JX 110 at 8; Tr. 238:18–239:17 (Querry).

[30] Tr. 238:18–239:17 (Querry).

[31] *Id.*; *see also* JX 110 at 8 (Hillrom presentation describing mechanics of technical fees).

Medicare reimburses Bardy at the rate that has historically been set by Novitas.[32] In 2020, the Novitas reimbursement rate was $365 per patch. Over the eight-year period before the Merger, "that rate had remained largely unchanged, give or take a couple of dollars."[33]

If a patient is insured by a commercial (private) third-party payor, then Bardy's reimbursement rates are determined through negotiation with each payor.[34] When determining whether to contract with a commercial payor, Bardy considers if it (i) can obtain a higher payment by negotiating a fixed rate, or (ii) should remain non-contracted and charge a percentage of its "usual and customary" rates as an "out-of-network" provider.[35] Bardy's largest commercial payors in 2020 were Horizon BCBS (roughly 28% of Bardy's patients), United Health Care (9%) and Aetna (6%).[36]

In 2020, the split billing model accounted for roughly two-thirds of Bardy's revenue.[37] Because it is the more profitable of its two models, Bardy projects that

---

[32] PTO ¶¶ 16–19.

[33] Tr. 170:19–23 (Querry).

[34] *Id.* at 157:5–7 (Querry).

[35] *Id.* at 157:15–159:4 (Querry); *id.* at 251:20–252:6 (Burke).

[36] Tr. 157:18–158:14 (Querry).

[37] *Id.* at 155:1–156:4, 170:19–23 (Querry); JX 700 at 2.

split billing will account for an increasing proportion of its revenue in the years to come.[38]

### 2. Fee-For-Service Billing

Bardy earns the balance of its revenue through its so-called "fee for service" model, under which Bardy sells its CAM patch and IDTF services to physicians and hospitals for a negotiated flat fee.[39] The healthcare provider then bills the insurer under a "global" rate that incorporates both the professional and technical components.[40] The healthcare provider's profit is the delta between the flat fee paid to Bardy and the reimbursement received under the global rate.[41]

### C. Bardy's Competition

The AECG market in which Bardy operates is comprised of Bardy and three main competitors: iRhythm, BioTelemetry and Preventice.[42] iRhythm is Bardy's "main" and "most logical" competitor.[43] Like Bardy, iRhythm derives nearly all its

---

[38] Tr. 156:5–12 (Querry); JX 613 at 8.

[39] PTO ¶ 20; Tr. 235:1–237:15 (Querry).

[40] JX 110 at 8.

[41] (Burke) Dep. 59:6–10.

[42] PTO ¶ 21.

[43] Tr. 125:13–14 (LaViolette); *id.* at 159:5–13 (Querry); *see also* (McClanahan) Dep. 98:14–99:6 (noting that Hillrom specifically looked at iRhythm's growth rates and margin expectation when it was assessing Bardy's value).

revenue from its extended AECG patch.[44]  BioTelemetry and Preventice offer AECG patches that are lower cost and lower quality, but both companies focus primarily on MCOT devices that target different patients than those who will benefit from extended AECG monitors.[45]

**D. Overview of the ACM Medicare Reimbursement Landscape**

As mentioned, reimbursement rates under Medicare are set for specific CPT codes tied to particular services.  CMS, an arm of the federal Department of Health and Human Services, develops and administers Medicare's reimbursement policy, overseeing the adoption and pricing of CPT codes for medical services.[46]

CMS sets prices informed by its "Triple Aim," which seeks to promote: (1) the health of each individual patient beneficiary; (2) health for populations, including managing healthcare disparities; and (3) lower costs.[47]  To better achieve these goals,

---

[44] *See* Tr. 159:5–13 (Querry); JX 631 at 39–40 (estimating iRhythm derives 96% of its revenue from its AECG patch product).

[45] *See* Tr. 511:22–512:7 (Frank) (noting extended AECGs constitute "a very small part" of BioTelemetry's business); *id.* at 159:14–160:3 (Querry) (listing modalities offered by BioTelemetry and Preventice); *see also id.* at 32:21–33:6 (Bardy) (explaining MCOTs are not interchangeable with extended AECGs).

[46] JX 635 at 5–9 (describing what CPT codes are and how they are developed).

[47] Tr. 313:12–314:15 (Renbaum).

14

CMS is moving toward a "forward-looking preventative care approach"[48] focused on doing "the right thing for the right patient at the right time."[49]

In certain situations, CMS assigns Temporary Category III CPT codes to new services and then delegates pricing authority to local MACs.[50] From a device-maker's perspective, there is no practical difference between a MAC-set price and a CMS-set price: a MAC's price bears the full weight of CMS's authority and it is illegal to bill a Medicare patient above the rate set by an authorized MAC.[51]

When a service with a temporary CPT code is more widely utilized, stakeholders typically petition the CPT Editorial Panel to set permanent Category I codes, signaling to physicians that a service has become part of the "standard of care" that can be billed at predictable reimbursement rates for Medicare patients.[52] When a Category I code is proposed, the American Medical Association's Resource-Based Relative Value Scale Update Committee (the "RUC"), working with CMS, develops a pricing recommendation after a detailed review of costs, including

---

[48] (Kohler) Dep. 119:23–120:15; *see also* Tr. 626:18–22 (Kohler).

[49] Tr. 320:13–18 (Renbaum).

[50] *Id.* at 625:10–12 (Kohler); JX 635 at 5–9.

[51] 42 U.S.C. § 1395w-22; Tr. 169:6–170:1, 171:18–172:3 (Querry); *id.* at 311:5–12 (Renbaum).

[52] Tr. 303:20–304:5 (Renbaum); *id.* at 116:7–117:3 (LaViolette); *id.* at 160:9–23 (Querry); JX 635 at 6–10.

equipment, supply and clinical labor.[53]  CMS can choose to accept the RUC's recommendation, adjust pricing based on its own analysis or delegate pricing to MACs.[54]

Though MAC prices are functionally equivalent to CMS prices, the *processes* by which these entities determine their final prices could not be more different. MACs are regarded by industry participants as "black boxes"—they do not explain their reasoning when they set rates and can change their rates at any time.[55]  CMS's rate-setting process, by contrast, is transparent and "iterative," building upon prior analyses and input from stakeholders.[56]  While CMS does not disclose the matters it is considering while it studies a proposed rule,[57] it does explain its reasoning at the

---

[53] Tr. 310:7–302:1 (Renbaum); JX 635 at 9.

[54] JX 635 ¶ 18.

[55] Tr. 371:20-372:11 (Renbaum); *id.* at 634:14–636:1 (Kohler); *id.* at 241:5–22 (Querry); JX 632 ¶ 25 (Hillrom's expert explaining "the processes by which the MACs determine pricing are comparatively less transparent" and "the price set by any one MAC may not be as intellectually defensible from a valuation perspective as the rates set by CMS, whose standard, methodical rate-setting process" is more transparent); JX 671 at 2.

[56] Tr. 312:9–313:11, 350:17–24, 360:3–362:7 (Renbaum); JX 671 at 6–7.

[57] Tr. 360:3–363:9 (Renbaum); *see also id.* at 639:3–24 (Kohler) (describing the "big blank" in the timeline between a RUC recommendation and CMS proposed rule during which there are "questions back and forth" between CMS and stakeholders that "[w]e don't see" because "[i]t's not public information").

time the rule is published.[58] This contrast in processes is well known to everyone involved with Medicare reimbursement.[59]

### E. Hillrom Explores an Acquisition of Bardy

Hillrom had long wanted to enter the ACM space and viewed the extended AECG segment in particular as an "expanding category" with significant growth potential.[60] In 2019, Hillrom engaged a consultant, Health Advances LLC, to perform market research and to evaluate a potential strategic transaction in the ACM space.[61]

In January 2020, Bardy investor and board member, Paul LaViolette, discussed Bardy's business with Hillrom CEO, John Groetelaars.[62] Following this discussion, Hillrom determined that Bardy's "differentiated technology" would complement Hillrom's existing short-term Holter business,[63] making it a "good

---

[58] Tr. 640:1–24 (Kohler).

[59] *Id.* at 363:3–9 (Renbaum).

[60] *Id.* at 521:11–522:22 (Frank); JX 110 at 4 (Hillrom strategic assessment highlighting "High Growth Segment" in the "What We Like" row); (Blanchard) Dep. 24:7–10.

[61] Tr. 509:18-512:1 (Frank); JX 23; JX 28 at 4, 7; JX 48; (Blanchard) Dep. 66:9–20; (Kucheman) Dep. 40:7-10.

[62] PTO ¶ 22; Tr. 95:17–20 (LaViolette).

[63] JX 365 at 3, 9; Tr. 489:11–22 (Frank); JX 366 at 2 (describing strategic rationale for the Merger); (Kucheman) Dep. 18:5–22, 42:13–23, 83:18–84:8 (explaining Bardy "would help to diversify the preexisting diagnostic cardiovascular product line . . ."); (Blanchard)

strategic fit" for an acquisition.[64]   Hillrom also viewed Bardy's ICM (in development) as "ha[ving] the potential to revolutionize disease treatment and early diagnosis."[65]   Although Bardy was not for sale, both sides grew increasingly interested in a transaction as discussions progressed.[66]

Of course, Hillrom knew Bardy was a typical venture-backed startup in the sense that it was focused in the near term on growth, not profitability.   Indeed, Hillrom knew that: Bardy had never turned a profit; it was projected to incur significant losses in 2021; and the acquisition was not projected to be accretive until FY 2023 at the earliest.[67]   Since its inception, Bardy's management has been laser-focused on aggressively increasing revenue, expanding infrastructure and personnel,

---

Dep. 43:3–44:10; *see also* JX 149 at 15, 21 (internal Hillrom document explaining strategic rationale for the Merger); JX 63 at 8 (same).

[64] (McClanahan) Dep. 20:13–21:14; (Roehrich) Dep. 28:6–24; *see also* JX 109 at 5 (internal Hillrom investment memorandum explaining strategic rationale of the Merger); JX 157 at 3–5, 31 (same); JX 173 at 3, 16 (same).

[65] JX 340 (internal email from Groetelaars stating, "[t]he ICM is the type of bold innovation that this company needs a little more of and it is necessary that we acquire it and then support the development and commercialization of it."); *see also* Tr. 609:12–611:8 (Groetelaars) (acknowledging the email).

[66] PTO ¶ 23; Tr. 109:8–18 (LaViolette); *id.* at 509:8–11 (Frank).

[67] JX 365 at 19; Tr. 490:13–22 (Frank); *see also* JX 41 at 41 (internal Hillrom presentation acknowledging Bardy's financial profile entails near-term losses); Tr. 62:11–15 (Bardy) (explaining that Bardy has never turned a profit); *id.* at 102:9–103:19 (LaViolette) (same); *id.* at 153:4–11 (Querry) (same).

and developing new technologies.[68]   Their efforts have paid dividends; Bardy's revenue has grown exponentially, from $1.4 million in 2017 to over $26 million in 2020.[69]  This revenue expansion has been fueled by a compounded annual growth rate of 243% from 2018 through 2020, with enrollments (i.e., demand) for CAM patches increasing 91% in 2020.[70]

Hillrom further appreciated that Bardy's future profitability was, in significant part, dependent on Medicare rates for extended AECG devices, and that prices for devices such as Bardy's were subject to change due to the anticipated shift to Category I CPT codes.[71]   But Hillrom viewed the risk of a significant change in Medicare reimbursement rates as low and, given Bardy's dynamic growth, Hillrom believed it "could absorb" Bardy's short-term lack of profits because the Company would serve as "a platform for [future] growth."[72]

---

[68] Tr. 153:12–154:1 (Querry); *id.* at 102:11–22 (LaViolette).

[69] Tr. 150:15–23 (Querry).

[70] *Id.* at 151:4–20 (Querry).

[71] *See* Tr. 512:15–516:3 (Frank) (acknowledging that a change in Medicare reimbursement rates for LTH devices would have impact Bardy more than Biotelemetry); JX 48 at 10–11 (observing that the "[s]ustained attractiveness" of an ACM acquisition was contingent on "Category I shift ha[ving] minimal LTH reimbursement reductions").  Hillrom recognized in public disclosures that its own business faced "significant uncertainty" from, among other things, "changes in Medicare, Medicaid, and other governmental medical program reimbursements[.]"  JX 8 at 7–8; Tr. 583:15–24 (Groetelaars).

[72] (Blanchard) Dep. 93:6–94:4, 143:10–144:10.

**F. CMS Issues its Proposed Fee Schedule**

The CPT Editorial Panel of the AMA recommended Category I codes for extended AECG monitoring effective in January 2021.[73] The RUC subsequently met to approve a pricing recommendation for the codes,[74] but it did not receive invoices for use in its cost build-up because IDTFs generally bill directly to Medicare rather than selling patches to physicians.[75] Thus, when the RUC ultimately recommended an increase in Medicare reimbursement to $438.94 per patch, it had relied not on actual costs but on the weighted mean of payment for these services to CMS, which it viewed as a "reasonable proxy."[76]

On August 4, 2020, CMS published its proposed physician fee schedule for 2021, which proposed adopting permanent "Category I" codes for long-term AECG monitors, including separate codes for 2-to-7 day tests and 7-to-14 day tests (the "Proposed Fee Schedule").[77] It also proposed national rates for the diagnostic component of those two codes of $451.24 and $463.92, respectively, for the territory

---

[73] JX 635 at 10–12.

[74] Tr. 302:10–303:1, 304:13–305:6 (Renbaum); JX 13 at 41.

[75] Tr. 303:20–304:12 (Renbaum); JX 13 at 40–41; *see also* Tr. 185:19–188:3 (Querry) (describing Bardy's effort to come up with a similar cost build-up using Bardy's invoices for direct sales as "confirmatory" of historical rates); JX 498.

[76] Tr. 306:8–307:6 (Renbaum); JX 13 at 41–42; JX 70 at 2–3.

[77] JX 70.

20

that encompassed Bardy's New Jersey IDTF.[78]  CMS noted, however, that it had not received traditional invoices for the devices to support its cost analysis and would "continu[e] to gather more data to come to a final decision."[79]

### G. Hillrom Conducts Diligence into Bardy

Approximately three-weeks following the release of CMS's published fee schedule, on August 25, 2020, executives from Hillrom and Bardy met again to discuss a potential acquisition.[80]  During the meeting, and again in a subsequent September presentation, Bardy laid out its financial model for 2021–2025, which incorporated increased revenue and gross margins based on CMS's proposed rates.[81] Bardy also saw an "[o]pportunity to reset commercial rates higher commensurate with [the proposed rise in] new Medicare rates."[82]

Following preliminary due diligence, on September 1, 2020, Hillrom submitted an initial offer to acquire Bardy for $400 million.[83]  On September 24, 2020, Hillrom sweetened the offer when it submitted a non-binding initial indication

---

[78] PTO ¶ 28; JX 93 at 8.

[79] Tr. 307:1–308:17 (Renbaum); JX 70 at 2–3.

[80] PTO ¶ 25.

[81] JX 95 at 8, 76–85; JX 153 at 4.

[82] JX 153 at 15, 30.

[83] PTO ¶ 25; Tr. 112:1–24 (LaViolette); JX 111.

of interest ("IOI") to acquire Bardy for $450 million plus potential earnouts.[84] Bardy accepted Hillrom's IOI and the parties proceeded with more rigorous due diligence.[85]

By all accounts, the due diligence process was "extensive [and] disciplined."[86] Hillrom prepared various financial models, all of which contemplated dilution in the two years post-acquisition.[87] Though Hillrom identified BioTelemetry, iRhythm and Preventice as points of comparison against Bardy,[88] it focused on iRhythm as Bardy's closest comparable and carefully evaluated iRhythm's public disclosures, stock price and other metrics during due diligence.[89]

---

[84] JX 137 at 7.

[85] PTO ¶ 26.

[86] (Blanchard) Dep. 164:12-16; *see also* Tr. 167:23–168:11 (Querry) (describing at a high level what Hillrom's diligence process entailed).

[87] (McClanahan) Dep. 50:3-23 ("Q. Do you recall seeing any models of an acquisition of Bardy by Hill-Rom where the year 1 or 10 year zero return was positive? A. Not that I recall. Q. Approximately how many different models of a potential acquisition of Bardy by Hill-Rom did you look at over the entire course of the M&A process? A. Quite a few. I can't recall a specific number, though. . . . Q. More than 20; is that a fair estimate? A. That could be."); JX 108; JX 123; JX 157 at 3, 17–23; JX 173 at 19–24.

[88] JX 365 at 12.

[89] *See* JX 157 at 22 (focusing on iRhythm's profit & loss history and forecast comparable); JX 337 at 28 (Board deck singling out for comparison iRhythm's revenue multiple); JX 272 at 3 (M&A Committee member tying deal element to iRhythm's share price); JX 367 at 14 (1/11/2021 Hillrom Board approval deck noting iRhythm trading multiple); (Roehrich) Dep. 45:6–12 (noting that Hillrom "looked at what iRhythm, as another company in this space, had put out publicly"), 91:14–92:7 (explaining Hillrom based its views on pricing

Among Hillrom's key goals in due diligence was to "validate" whether the reimbursement rates in the Proposed Fee Schedule would be finalized or "meaningfully impacted" through the comment period.[90] Hillrom tasked its in-house reimbursement expert, Kari Roehrich, with leading an "entire workstream dedicated to reimbursement for [Bardy]."[91] Beyond Hillrom's own in-house expertise, Roehrich and her team reviewed analyst reports, monitored public comments, relied on the advice of their outside advisors at King & Spalding and Health Advances and received input from healthcare consultant, David Parr.[92]

On October 5, 2020, Muller Consulting & Data Analytics submitted a comment to the Proposed Fee Schedule that advocated for reimbursement rates of $66.25 for the 2-to-7 day code and $8.66 for the 7-to-14 day code.[93] Following this

changes in part on "everything we had . . . read from iRhythm analysts"); (Blanchard) Dep. 277:13–19; (McClanahan) Dep. 98:4–99:6 (noting that Hillrom looked specifically at iRhythm's growth rates and margin expectation when they were assessing the future value of Bardy).

[90] *See* JX 110 at 5 (listing as a point "requir[ing] validation" that "[r]eimbursement rate changes for [extended AECG] announced in August of 2020 are not meaningfully impacted through the 'comment period' and are stable in 2021 and beyond"); *see also* Tr. 168:8–11 (Querry) (confirming that there were questions about reimbursement during "[a]lmost . . . every interaction with the Hillrom team").

[91] JX 141 at 2; JX 169; *see also* Tr. 527:12–17 (Frank) (acknowledging Hillrom had internal and external experts evaluating reimbursement rates).

[92] Tr. 527:18–528:19, 533:7–12 (Frank); *id.* at 581:12–582:9, 600:5–601:1 (Groetelaars); JX 169; JX 197 (Parr email to Hillrom); JX 246.

[93] Tr. 529:1–15 (Frank); *id.* at 593:15–595:11 (Groetelaars); JX 150 at 3; JX 170.

23

announcement, Parr warned Hillrom that historical Novitas "payment is at risk" and "[p]rojections built off one or two outlier payors [Novitas and Palmetto] are a huge red flag."[94]  Even though this was not the first warning regarding reimbursement rates Hillrom received from its outside advisors,[95] Hillrom chose to view the risk differently.[96]

Ultimately, Roehrich's investigation culminated in a report where she recommended that, because "CMS has yet to finalize the 2021 Physician Fee Schedule," Hillrom should wait to "close/sign[] [the Merger until] after the publication of the Fee Schedule to eliminate any negative impacts to CMS pricing (and therefore valuation)."[97]  The recommendation for delay was intended to "give

---

[94] JX 197 at 1–2; (Roehrich) Dep. 85:18–92:7.

[95] *See* JX 51 at 109 (Health Advances identifying in May 2020 risk that reimbursement for extended AECG could "switch[] to Category I *with a significant reduction in value (>20-30%).*" (emphasis added)); *see also* JX 165 at 11 (Health Advances report stating on reimbursement changes: "Anticipate modest (~5-10%) declines in LTH revenue, but feedback is divergent on impact and exact details are still uncertain").

[96] *See* Tr. 529:1–19 (Frank) (characterizing Muller Report as an outlier); *see also* (Roehrich) Dep. 85:18-92:7 (discussing Parr's view as detailed in JX 197, and noting that the Hillrom team was "generally interested" in Parr's opinion but concluded any pricing change would be "modest").  Following the December CMS decision, Parr again warned that because Novitas was the "highest priced MAC contractor, there may be risk that their pricing moves more to the mid-range once [] codes are permanent."  Tr. 533:7–534:21 (Frank); JX 246.  Hillrom's management again dismissed these concerns; indeed, as Frank testified, having heard Parr's warnings, Hillrom declined to hire him as a permanent advisor.  Tr. 478:5–9, 536:14–537:7 (Frank).

[97] JX 205 at 8, 70; *see also* JX 249 at 7, 65 (identifying as the first item among the Merger's "[k]ey weaknesses and threats / issues" in Hillrom's 11/18/20 diligence recap: "CMS has

[Hillrom] certainty as to what CMS national pricing would look like for the new CPT codes."[98]  Hillrom decided to follow that recommendation and to wait for CMS's final fee schedule before executing any agreement.[99]

## H. CMS Announces Its Final Rule but Defers to MAC Pricing

On December 1, 2020, as Hillrom's diligence was ongoing, CMS issued the 2021 Final Fee Schedule, in which it adopted permanent Category I codes for extended AECG patches but delegated pricing for those codes to the regional MACs "for CY 2021" with a stated intent to return to the decision in future rulemaking.[100] CMS explained that its deferral was motivated by its desire to collect further data reflecting cost information for the patch devices.[101]  The upshot was that, for the

yet to finalize the 2021 Physician Fee Schedule . . . . Recommending deal close / signatures after the publication of the Fee Schedule to eliminate any negative impacts to CMS pricing (and therefore valuation)"); JX 195 at 2 (identifying "[r]eduction in CMS proposed rates in final CMS Fee Schedule for 2021" as a "Key Risk" and recommending "Final closing after publication of CMS Fee Schedule for 2021" as potential "[m]itigation").

[98] (Roehrich) Dep. 112:1–113:2; *see also* Tr. 538:23–539:8 (Frank) (agreeing that Roehrich's recommendation to wait for certainty on CMS pricing was grounded in her fear that there could be a reduction in CMS's proposed rates in the final CMS schedule for 2021); (Blanchard) Dep. 181:6–15.

[99] Tr. 472:2–5 (Frank).

[100] PTO ¶ 28; JX 349; JX 350 at 3; Tr. 308:18–311:4 (Renbaum); JX 233; JX 357 at 8.

[101] Tr. 337:24–338:17 (Renbaum).

time being, Novitas would remain responsible for setting the prevailing reimbursement rates for the CAM patch's CPT codes.[102]

In the wake of the prolonged uncertainty provoked by CMS's decision,[103] Hillrom went back to the drawing board with its internal and external reimbursement experts to evaluate likely outcomes of a Novitas-set rate.[104] Given Novitas' historically stable pricing for long-term AECG tests, Hillrom concluded the most likely scenario was that Novitas would revert (or "crosswalk") to the 2020 Category III rates.[105] Based on that expectation, Bardy refreshed its September forecast by using the 2020 rates, which resulted in estimated revenue of $57 million for 2021 and $89 million for 2022 (declines of $7 million and $11 million, respectively).[106] Both before and after the announcement of the 2021 Final Fee

---

[102] PTO ¶¶ 15–16, 32.

[103] Tr. 117:4–118:18 (LaViolette); JX 278 at 2; *see also* Tr. at 477:18–478:4 (Frank) (acknowledging pricing had been kicked back out to the MACs); *id.* at 597:11-600:3 (Groetelaars) ("Q: Nothing was certain until the rates were published; right? A: That's correct.").

[104] Tr. 531:20–532:3 (Frank); *id.* at 581:12–18 (Groetelaars) (agreeing Hillrom "had the advice of outside experts and consultants to understand the various mechanics and the decision dates that were to occur around reimbursement"); JX 246; JX 392; JX 434.

[105] Tr. 597:19-598:16 (Groetelaars); JX 254 at 29. The Bardy team agreed that Hillrom's assumption of stable rates was "reasonable." Tr. at 129:14–24 (LaViolette); *id.* at 170:14–171:17, 209:2–10, 210:5–8 (Querry); *id.* at 67:24–68:3 (Bardy) (stating he "did not see any risk in December of 2020 that reimbursement rates would decrease in 2021.").

[106] Tr. 172:4–174:6 (Querry); JX 254 at 36–37.

Schedule, Bardy was careful not to represent that Novitas would set any particular rate, as both parties agreed that the price ultimately set by Novitas or CMS was "unknowable" *ex ante*.[107]

## I. Hillrom Renegotiates the Merger

Days after the December announcement of the 2021 Final Fee Schedule, Hillrom terminated the IOI so that it could renegotiate the deal's financial terms.[108] The "most material" reason for renegotiating was CMS's refusal to adopt a national Medicare reimbursement rate, introducing risk that the CAM patch would

*Remainder of Page Intentionally Left Blank*

---

[107] *See* Tr. 171:8–11 (Querry) ("No, I didn't [represent to anyone what the rates would be]. I mean, we couldn't. It was really unknowable at that point in time."); *id.* at 586:4–7 (Groetelaars) (agreeing no representation was made before or in the Agreement as to Novitas rates); JX 254 at 27–33.

[108] *See* JX 275 (email to Bardy setting out revised proposal for the Merger following CMS's December announcement).

be priced below the level proposed (but never adopted) by CMS.[109] Hillrom wanted to shift more economic risk to Bardy to address that possible outcome.[110]

The mechanism by which Hillrom shifted that risk was to propose a different earnout.[111] Lower reimbursement rates would lower Bardy's revenue. Hillrom thus proposed, and the parties ultimately agreed, that (i) Hillrom would pay a lower up-front purchase price of $375 million (down from $450 million); and (ii) Hillrom would pay contingent earnout consideration linked to estimated CAM patch revenue for 2021 and 2022, structured as follows:[112]

---

[109] Tr. 601:11–17 (Groetelaars); *see also id.* at 607:15–608:6 (Groetelaars) (acknowledging that, in JX 296, Groetelaars wrote to the Hillrom board of directors after CMS's December announcement and explained that, in light of the announcement, Hillrom would need to renegotiate the Merger's financial terms); *id.* at 117:4–18, 119:13–122:13, 145:10–20 (LaViolette) ("The December outcome . . . allowed for some of the uncertainty from earlier in the year to persist. And so Hillrom approached us and said they were uncomfortable with that level of uncertainty. They were not willing to, as a result, stand behind the terms of the agreed LOI and wanted to change them"); JX 234; JX 296 at 3; (Blanchard) Dep. 214:19–215:15 (explaining CMS decision was the "perfect . . . door opener" for Hillrom to renegotiate: "[o]h, by the way, look what I found on due diligence").

[110] Tr. 118:14–18 (LaViolette); *see also id.* at 482:7–14 (Frank) ("In my view, we adjusted down the upfront payment of the consideration commensurate with [] the fact that rates were back in the MAC jurisdictions or the MAC sort of setting.").

[111] *See* PTO ¶ 29; Tr. 118:14–18 (LaViolette); JX 418 at 1 (Hillrom CEO Groetelaars identifying the earnout as a risk-sharing tool that limited Hillrom's downside after Novitas announced a reimbursement rate decrease for Medicare patients).

[112] PTO ¶ 30; Tr. 175:14–176:15 (Querry); JX 317 at 2–3; JX 254; JX 376 § 1.14.

| Earnout Level (% of Revenue) | 2021 Revenue Targets | 2022 Revenue Targets |
|---|---|---|
| 50% | <$45 million | < $70 million |
| 100% | ≥ $45 million | ≥ $70 million |
| 150%(2021)/125%(2022) | ≥ $57 million | ≥ $89 million |

If Bardy hit its projected revenue targets ($57 million and $89 million), then Hillrom would pay to Bardy's stockholders 100% of the revenue for those two years *and* pay a 50% and 25% premium to those revenues, respectively. If Bardy missed its revenue targets by a modest amount (no more than $12 million and $19 million in 2021 and 2022, respectively), then Hillrom would still pay 100% of the revenue to Bardy's stockholders but no premium. Thus, Hillrom had no expectation of retaining any revenue for those years if Bardy grew as (or slightly slower than) expected. Conversely, if Bardy missed those revenue targets by a significant amount for whatever reason (including a change in reimbursement rates), Hillrom would pay only 50% of the revenue for those years.[113]

While Hillrom priced into the deal some risk that Novitas would decrease Medicare reimbursement rates,[114] it nevertheless viewed a change in reimbursement rates as unlikely. On January 11, 2021, for example, in a presentation to Hillrom's Board seeking approval of the Agreement, Hillrom's deal team did not include

---

[113] Tr. 176:2–15 (Querry).

[114] *See* JX 418 at 1 (Hillrom CEO Groetelaars acknowledging that the earnout shifted onto Bardy risk of lower Medicare reimbursement rates).

among the "key risks" a lower reimbursement rate.[115] Nor did Hillrom's financial models incorporate a significant decrease in Medicare reimbursement rates.[116]

In any event, even assuming a Novitas rate reversion to $365, Hillrom's Board was advised that Bardy was not expected to be value accretive until FY 2023, and Hillrom did not expect positive returns on invested capital in the first two years of owning Bardy.[117] The presentation to Hillrom's Board also referenced iRhythm's trading multiple (and no other companies) as a "relevant data point" to consider in evaluating Bardy's valuation.[118] With this data in hand, Hillrom's Board decided to forge ahead with the Merger prior to Novitas' announcement of Medicare's reimbursement rate.

---

[115] JX 365 at 17; *see also id.* at 14 ("Price anticipated to remain close to / at current rates."); Tr. 612:1–17 (Groetelaars) (stating that the risk was considered "retired," meaning "nothing to be concerned about."); *but see* JX 337 at 26 (identifying "[s]trong reimbursement" as among the "[k]ey assumptions" of Hillrom's financial model); JX 197 at 1–2 (warning Hillrom that historical Novitas "payment is at risk" and "[p]rojections built off one or two outlier payors [including Novitas] are a huge red flag.").

[116] Tr. 489:4–10 (Frank); JX 365 at 19; *see also* Tr. 172:4–23 (Querry); (explaining Bardy's projections also did not incorporate a significant decrease in Medicare reimbursement rates); JX 254 at 38.

[117] Tr. 519:4–16 (Frank); JX 335 at 5; JX 356 at 3; JX 123 at 11; JX 337 at 29; JX 313 at 7; (McClanahan) Dep. 144:9-145:5 (explaining Hillrom did not present ROIC for first two years in JX 313 at 7 because Hillrom "knew it would be negative"), 168:12–17 (acknowledging acquisition would be EPS dilutive for first three years).

[118] (McClanahan) Dep. 165:11–166:5; JX 337 at 28 (singling out iRhythm's trading multiple in slide titled "Valuation Considerations").

## J. Hillrom and Bardy Sign the Agreement

On January 15, 2021, the parties executed the Agreement, which set the price of Hillrom's acquisition of Bardy at $375 million plus potential earnouts.[119] The Agreement does not contain any representations or warranties covering reimbursement rates or Bardy's projected revenue.[120] It also contains broad integration and "non-reliance" language.[121]

Relevant here, the Agreement conditioned Hillrom's obligation to consummate the Merger on (a) the non-occurrence of a Company MAE; (b) the truthfulness of Bardy's representations and warranties (the "Bring-Down Condition"); and (c) Bardy's compliance with certain covenants contained in the Agreement. The applicable provisions of the Agreement are discussed below.

### 1. The MAE Clause

Under the Agreement, Hillrom is not obligated to close and can terminate the Agreement if a "Company Material Adverse Effect" has occurred.[122] As is common,

---

[119] JX 378.

[120] Tr. 586:4–7 (Groetelaars); *see generally* JX 376 art. 2.

[121] JX 376 § 2.32; Tr. 586:8–588:2 (Groetelaars).

[122] JX 376 §§ 2.7, 5.1(c), 6.1(b). Specifically, Bardy represented in Section 2.7 of the Agreement that "[s]ince December 31, 2019, there has been no Company Material Adverse Effect." *Id.* § 2.7.

31

the Agreement defines a "Company Material Adverse Event" in three parts.[123] The "definition starts with a general statement of what constitutes an MAE," then "carves out certain types of events that otherwise could give rise to an MAE," and then creates "exceptions to the carve-outs."[124]

The base MAE is defined as "any fact, event, circumstance, change, effect or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on . . . the Business of the Acquired Companies, taken as a whole."[125] The Agreement defined Bardy's "Business" to mean its:

> Collective[] engage[ment] . . . in the design, development, manufacture, production, assembly, marketing, promotion, distribution, sale, clinical use and other commercialization activities involving certain currently-marketed and in-development cardiac digital health, diagnostic, data management and remote patient monitoring devices (including ambulatory cardiac monitors), technologies and services (including independent diagnostic testing, interpretation and cardiac monitoring services).[126]

The Agreement lists several carve-outs from the definition of a Company MAE. Relevant here, the Agreement carves out: (1) "any condition or change in

---

[123] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *51 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

[124] *Id.*

[125] JX 376 at 88.

[126] *Id.* at 5.

economic conditions generally affecting the economy or the industries or markets in which the Acquired Companies operate" and (2) "any change in any Law (including any COVID-19 Measures and any Health Care Law) or GAAP or any interpretation thereof."[127]

The Agreement then provides for an exception to those carve-outs. Specifically, the Agreement states that a carved-out event can nonetheless constitute an MAE "to the extent such matter has a materially disproportionate impact on the Acquired Companies as compared to other similarly situated companies operating in the same industries or locations, as applicable, as the Business."[128]

### 2. The Bring-Down Condition and the Covenants

In Section 5.1(a), the Agreement provides that, as a condition precedent to Hillrom's obligation to close, certain representations and warranties "must have been true and correct . . . as of the date of this Agreement and must be true and correct as of the Closing Date . . . except . . . as would not have a Company Material Adverse Effect."[129] Section 5.1(b) of the Agreement further provides that, as a condition precedent to Hillrom's obligation to close, Bardy "must have performed and complied with in all material respects the covenants and obligations under this

---

[127] *Id.* at 88–89.

[128] *Id.* at 89.

[129] *Id.* § 5.1(a).

Agreement required to be performed or complied with by it prior to Closing."[130] Finally, Section 5.1(c) of the Agreement contains a stand-alone closing condition that "No Company Material Adverse Effect shall have occurred."[131]

### 3. The Termination Clause

Under Section 6.1(b), the Agreement may be terminated "upon a material breach of any representation, warranty, covenant, or obligation" that Bardy "set forth in this Agreement such that the conditions set forth in Section 5.1(a) or Section 5.1(b) are incapable of being satisfied and, if such breach is curable, such breach is not cured prior to the expiration of twenty (20) days following [Bardy's] receipt of written notice thereof from [Hillrom]."[132] Otherwise, Hillrom was obligated to close within three business days after the closing conditions were satisfied.[133]

### 4. The Remedies Provisions

In Section 9.11 of the Agreement, the parties agreed that specific performance was not exclusive of an award of damages in the event of a breach of the

---

[130] *Id.* § 5.1(b).

[131] *Id.* § 5.1(c).

[132] *Id.* § 6.1(b).

[133] *Id.* §§ 1.3, 4.3(a).

Agreement.[134]  In Section 7.3, the parties further agreed that, after closing, Hillrom would "indemnify, defend and hold harmless the Equityholders . . . from, and will reimburse the Equityholder Indemnified Parties for, all Adverse Consequences suffered or incurred by the Equityholder Indemnified Parties, to the extent arising out of or related to a breach or non-fulfillment by Parent or Merger Sub[.]"[135] "Adverse consequence" is defined to include any "expense, loss, liability, Tax or other damages" and "reasonable and out-of-pocket legal and other professional fees, costs, [and] other dispute resolution expenses[.]"[136]

### K. Hillrom Refuses to Close After Novitas Announces New Rates

On January 29, 2021, two weeks after the Agreement was signed, Novitas announced pricing for the new CPT codes applicable to extended AECG monitoring: $42.68 for Texas and $49.70 for New Jersey (the January Novitas Rate).[137]   Given Novitas' historically steady $365 per patch reimbursement rate for the category, the drastic rate cut was devastating news.  Under Bardy's split-billing model, Bardy could not profitably serve Medicare patients at the January Novitas Rate.[138]

---

[134] *Id.* § 9.11.

[135] *Id.* § 7.3.

[136] *Id.* at 81.

[137] PTO ¶ 32.

[138] Tr. 69:24–70:3 (Bardy).

Dr. Bardy described the new rates as "[m]ass murder of the elderly,"[139] and the parties on both sides were "shocked" by Novitas' pricing decision.[140]

Initial feelings of shellshock gave way to disbelief: Bardy, Hillrom and other industry participants concluded that Novitas must have made a mistake.[141] With this premise in mind, Bardy, iRhythm, BioTelemetry and Preventice launched an intense effort to educate Novitas on how appropriately to value long-term AECG patches.[142] Hillrom, for its part, supported the effort and made available to Bardy, at Hillrom's expense, the former medical director of Novitas to provide insight on effective messaging.[143] As one Bardy employee put it, the meetings with Novitas represented Bardy's "one shot" to persuade Novitas that its drastically reduced proposed rates were unjustified and unsustainable.[144]

---

[139] *Id.* at 50:4–17 (Bardy).

[140] *Id.* at 566:21 (Groetelaars); *id.* at 492:21 (Frank); *id.* at 139:3–140:4 (LaViolette); *id.* at 264:9–12 (Burke); JX 412 at 1 (then-Bardy CEO Kevin Hykes reacting to the news with a single word: "Stunning"); JX 526 at 9 (observing that the January Novitas Rate "activated the immune system of the [extended AECG industry").

[141] Tr. 177:15–178:14 (Querry); *id.* at 492:18–493:11 (Frank); *id.* at 566:19–567:2 (Groetelaars); *see also* JX 526 at 9 (observing that the January Novitas Rate "activated the immune system of the [extended AECG industry.").

[142] PTO ¶ 33; Tr. 73:23–77:7 (Bardy).

[143] Tr. 217:8–13, 231:21–24 (Querry).

[144] (Hykes) Dep. 253:11–15.

While the January Novitas Rate rattled Hillrom, its CEO, Groetelaars, took solace in the fact that Hillrom had insisted on a risk-shifting earnout in the signed Agreement, commenting in an internal email: "Good thing our deal has a risk share element in it and that our ASP is not as high. . . less downside risk."[145] Others on his team were less sanguine. Hillrom's Chief Financial Officer responded to the announcement of the January Novitas Rate (on the day of) by observing, "seems like an MAE to me."[146] Hillrom promptly engaged outside counsel to evaluate its options under the Agreement.[147]

Notwithstanding the uncertainty prompted by the January Novitas Rate, previously announced acquisitions of Bardy competitors proceeded apace to closing. Without any indication that Novitas would adjust the January Novitas Rate, Philips closed its acquisition of BioTelemetry (originally signed on December 18, 2020) and Boston Scientific closed its acquisition of Preventice (signed on January 21, 2021).[148] Hillrom came to view the announcement of the January Novitas Rate differently. On February 21, 2021, Hillrom notified Bardy that the January Novitas

---

[145] JX 418 at 1; *see also* Tr. 567:5–568:11 (Groetelaars) (explaining his reaction to the news as one grounded in his understanding that the earnout was a "risk-sharing mechanism").

[146] JX 421.

[147] JX 449 at 2.

[148] JX 725; JX 726; JX 727; JX 728.

Rate constituted an MAE under the Agreement, which relieved Hillrom of its obligation to close the Merger.[149]  Exactly one week later, on February 28, 2021, Bardy initiated this lawsuit.[150]

On April 10, 2021, nearly two months after its initial decision and having met with the leading extended AECG device makers, Novitas announced revised reimbursement rates in New Jersey of $120.49 and $133.47, and in Texas of $103.44 and $114.57 (the "April Novitas Rate").[151]  These adjusted rates represent a nearly three-fold increase from the rates set in the January Novitas Rate, but still mark a 63.5% decrease from Novitas' 2020 rate of $365.

**L. Bardy Negotiates with Commercial Payors Following the Novitas Announcements**

Meanwhile, Bardy engaged with commercial payors to set rates for the new Category I codes.[152]  Because commercial payors "deal with thousands of different providers," they typically "are not aware of the policy changes" affecting particular devices and rely upon providers like Bardy to alert them to changes and amend

---

[149] JX 562.

[150] D.I. 1.

[151] PTO ¶ 38; JX 520 at 5–22; JX 546.

[152] Tr. 245:17–22, 252:7–13 (Burke).

contracts as necessary.[153]  With one exception,[154] all of Bardy's contracted payors

have agreed to new rates for the Category I codes in line with their 2020 rates.[155]

The likely explanation for the apparent stability of Bardy's commercial pricing,

notwithstanding lower Medicare rates, is that commercial payors focus first and

foremost on the *value* of the service when negotiating price.[156]

---

[153] *Id.* at 252:14–23, 285:7–286:1 (Burke).

[154] One commercial payor, Cigna, has sought to use the January Novitas Rate and an assignment clause in its existing contract as leverage to negotiate for significantly lower reimbursement.  Tr. 256:11–14 (Burke); *id.* at 158:7–14 (Querry); JX 555; JX 704.  Bardy's seasoned Vice President of Payor Relations, Dan Burke, testified credibly that: Cigna (his former employer) had always been a "challenging" payor for Bardy; its 2020 rates were significantly below average; he did not expect Cigna to terminate its contract; Cigna had not invoked the 60-day termination process but instead sought to further engage to reach adequate terms; Cigna's communications were typical "posturing"; and Cigna was "fishing" for lower rates with all of the extended AECG providers.  Tr. 246:11–247:18, 253:18–254:4, 256:4–10, 257:3–258:20, 259:5–261:22 (Burke).

[155] Tr. 252:24–255:2 (Burke); JX 704; JX 627; JX 497; JX 558; JX 620.  iRhythm has likewise maintained similar pricing levels with commercial payors notwithstanding the Medicare rate decrease.  JX 665 at 8–9 (iRhythm investor call April 12, 2021).

[156] Tr. 250:1–16, 253:6–9, 261:23–262:9 (Burke) (explaining that, as a proxy for value, commercial payors look to (1) what providers rendering the same service are paying in-network and (2) what their spend is with the device provider as an out-of-network provider); *see also id.* at 251:1–19 (Burke) (asserting Medicare rates are not a factor in negotiations with commercial payors); *id.* at 156:21–157:12 (Querry) (same); *id.* at 320:19–321:20 (Renbaum) (explaining commercial insurers are "focused on themselves and each other," not Medicare, when negotiating rates).

Once rate negotiations are finalized, commercial payors are "unlikely" to amend contracts until there is another CPT coding change.[157] For that reason, Bardy does not expect any of its commercial payors to renegotiate their contracts within the next 12 months.[158]

## M. Bardy's Growth Continues

Despite the turbulence introduced by the Novitas rate reductions and this ensuing litigation, Bardy has continued to grow, setting new records for CAM enrollment and new CAM orders.[159] In Q1 2021, CAM enrollments increased 13% over Q4 2020 and 85% year-over-year, while CAM orders increased 12% over Q4 2020 and 89% year-over-year.[160] In April 2021, Bardy performed even better,

---

[157] Tr. 285:7–286:1 (Burke); *id.* at 320:19–321:20 (Renbaum) ("[O]nce they negotiate contracts and have them signed, they're just—they're done. They put them away and they move on. They're working on hundreds, maybe thousands, of contracts all year long. So once they're done with [] straightforward one or two CPT code contracts, they're happy to put those away and move on with their jobs.").

[158] Tr. 285:19–286:1 (Burke).

[159] Tr. 202:7–203:5 (Querry) ("[O]ur focus as a business is on growth. . . . This is where we are today in our business. We're in this growth phase."); *id.* at 190:23–191:23 (Querry); JX 702 at 3–5.

[160] Tr. 190:23–191:23 (Querry); JX 702 at 3–5 (Bardy Q1 financial update).

exceeding 21,000 orders in a month for the first time ever.[161]  These numbers are on target with Bardy's September 2020 forecast provided to Hillrom pre-Merger.[162]

Notwithstanding this growth, Bardy's revenue declined approximately 11% in Q1 2021 compared to Q4 2020 because of the rate change, although that revenue was still up 56% over Q1 2020.[163]  Bardy expects its growth to continue, and its unit economics with respect to Medicare beneficiaries remains profitable.[164]

**N. Industry Participants Continue to Engage with Novitas and CMS**

Dissatisfied with Novitas' current rates, industry participants in extended AECG monitoring continue to press for upward pricing revisions.  iRhythm has stated publicly that it is continuing a "multi-pronged approach to activating the specialty physician societies, including the AMA, the ACC and HRS, our individual physician customers and patients to directly engage decision-making authorities in the clinical importance of long-term continuous ECG monitoring."[165]  iRhythm's strategy included meeting with CMS in mid-March to discuss pricing

---

[161] Tr. 192:8–15 (Querry).

[162] *Id.* at 195:14–19, 197:1–12 (Querry).

[163] *Id.* at 192:18–193:11 (Querry).

[164] *Id.* at 189:12–21 (Querry).

[165] JX 646 at 6.

methodologies, including those that were used by the RUC and other alternatives.[166]

And more "meetings are being scheduled [and] have been scheduled" to speak with "multiple constituents both among the MACs as well as with CMS" in the coming months.[167] iRhythm expects to have an initial indication of whether CMS will set national rates for 2022 when CMS publishes its proposed rule in July or August this year.[168]

For its part, Bardy has engaged with a decisionmaker at Novitas, Dr. Andrew Bloschichak, to discuss the medical, public health and related economic challenges that extended AECG monitoring solve, including the benefits of the CAM patch specifically.[169] Bardy believes that rates for long-term AECG monitoring will continue to change to better reflect its clinical and economic value.[170]

---

[166] *Id.* at 8.

[167] JX 823 at 14; *see also* Tr. 832:17–833:5 (Noether) (recounting iRhythm's public announcement that it was pursuing "three different mechanisms to attempt to secure higher reimbursement for the LHM").

[168] JX 823 at 5.

[169] Tr. 51:20–52:2, 56:7–57:23 (Bardy); JX 716; JX 717.

[170] Tr. 51:20–52:2, 56:7–57:23 (Bardy).

## O. Procedural History

As noted, Plaintiff filed its Complaint on February 28, 2021, seeking specific performance of the Agreement.[171]  Defendants answered and counterclaimed for declaratory judgment on April 6, 2021.[172]  After pretrial briefing,[173] a three-day trial was held from May 5 through 8.[174]  The parties simultaneously submitted opening post-trial briefs on May 19, 2021,[175] and replies on May 27, 2021.[176]  The Court heard closing arguments on June 4, 2021, after which the matter was deemed submitted for decision.[177]

## II.  ANALYSIS

Bardy asserts Hillrom's failure to close the Merger breached the Agreement; Hillrom counterclaims for a declaratory judgment that its obligation to close is

---

[171] D.I. 1.

[172] D.I. 52.

[173] D.I. 65–66.

[174] D.I. 85–87.

[175] D.I. 82 (Hillrom Post-Trial Opening Br.) ("Defs.' Post-Trial Opening Br."); D.I. 83 (Bardy's Opening Post-Trial Br.) ("Pl.'s Post-Trial Opening Br.").

[176] D.I. 90 (Hillrom Post-Trial Reply Br.) ("Defs.' Post-Trial Reply Br."); D.I. 91 ("Pl.'s Post-Trial Reply Br.").

[177] D.I. 98 ("Post-Trial Oral Arg.").

excused.  Hillrom offers two separate but related grounds to justify its nonperformance, one contractual and one grounded in our common law.[178]

First, in its showcase argument, Hillrom asserts that the January Novitas Rate and April Novitas Rate both constituted an MAE under the Agreement.  Though the Agreement's MAE contains carve-outs for events generally affecting the market and changes in "Law," Hillrom asserts neither carve-out applies and, even if they did, the MAE's disproportionate-impact exception to those carve-outs renders the Novitas rate decrease an MAE nonetheless.

Second, Hillrom invokes the frustration of purpose doctrine, which "provides an escape for an acquirer if the target experiences a catastrophe during the executory period."[179]  According to Hillrom, the frustration of purpose doctrine operates to excuse its obligation to close here because the value of Bardy is so diminished that the Merger's essential purpose—"to acquire something of value"—is frustrated.

Both of Hillrom's theories turn on the Court finding as fact that Bardy's business has suffered materially.  But Hillrom's MAE argument, unlike its

---

[178] I note that Hillrom did not brief and so waived its counterclaims that Bardy breached covenants and representations in the Agreement (i) by improperly holding Medicare claims without seeking reimbursement; and (ii) in connection with its ongoing discussions with one commercial payor regarding its contracted reimbursement rate for the CAM patch. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[179] *Akorn*, 2018 WL 4719347, at *57 (internal quotations omitted).

frustration of purpose argument, is predicated, as a practical matter, on the Court's acceptance of its proffered interpretation of the bargained-for language contained in the Agreement.

"The primary goal of contract interpretation is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."[180] "If, on its face, the contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[181] Because it happens so often, this court barely takes notice when parties to a contract agree that the contract is unambiguous but disagree in litigation as to what the purportedly unambiguous language actually means. "Of course, dissensus regarding a contract's meaning among its signatories does not an ambiguous agreement make; 'a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[182]

---

[180] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (internal quotations omitted).

[181] *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at \*16 (Del. Ch. Mar. 15, 2017) (internal quotations omitted).

[182] *Pearl City Elevator, Inc. v. Gieseke*, 2021 WL 1099230, at \*9 (Del. Ch. Mar. 23, 2021) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)); *see also Greenstar IH Rep, LLC v. Tutor Perini Corp.*, 2019 WL 6525206, at \*9 (Del. Ch. Dec. 4, 2019) (holding that a "contract is unambiguous when the

When undertaking to construe a contract, our Supreme Court has instructed that the trial court must consider "[t]he basic business relationship between [the] parties" so that it can "give sensible life" to the agreement.[183] Accordingly, I begin the analysis by reviewing the context in which the parties negotiated the Agreement before turning to the contractual language. "With the Agreement's commercial context in hand, and mindful that my understanding of the parties' contractual relationship cannot overwrite an unambiguous contract,"[184] I then proceed to analyze whether the Novitas rate adjustments constitute an MAE as defined.

## A. The Basic Business Relationship Between These Parties

Both parties agree that Hillrom's interest in Bardy was sparked by the Company's growth prospects and its best-in-class LTH device, the economics of which depended in significant part on the rate at which Medicare priced its product.[185] The parties also agree that Hillrom, as a sophisticated healthcare

---

agreement's ordinary meaning leaves no room for uncertainty, and the plain, common, and ordinary meaning of the words . . . lends itself to only one reasonable interpretation.").

[183] *See Chi. Bridge & Iron Co. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[184] *Pearl City*, 2021 WL 1099230, at *9.

[185] JX 365 at 3, 9; Tr. 489:11–22 (Frank); JX 366 at 2 (describing strategic rationale for Merger); JX 51 at 24 (presentation to Hillrom's board explaining Bardy had developed a "[b]est in class device"); JX 204 at 3 (Hillrom's Dr. Johannes de Bie remarking, "I have little doubt that the [Bardy] solution (CAM+IDTF) is currently the clinically best solution for [extended AECG] for the diagnosis of infrequent arrhythmias and that it is not easy to

operator, knew that the price-setting process for devices within the same CPT codes as the CAM patch was underway during the Merger negotiations and that the methodology by which Novitas arrived at its pricing determination was opaque, rendering it "not [] as intellectually defensible from a valuation perspective as the rates set by CMS."[186] The parties dispute, however, whether and to what extent they intended to allocate the risk of Novitas making a downward adjustment to the reimbursement rate for the relevant CPT codes within the Agreement.

As an initial matter, Hillrom argues the Court should not concern itself with how the parties allocated risk in the contract because that allocation is "irrelevant" when interpreting an MAE clause.[187] Hillrom quotes Vice Chancellor Laster in *Akorn, Inc. v. Fresenius Kabi AG* for the proposition that such inquiries "would replace the enforcement of a bargained-for contractual provision with a tort-like concept of assumption of risk, where the outcome would turn not on the contractual language, but on an ex-post sifting of what the buyer learned or could have learned

---

copy"); *see also* (Blanchard) Dep. 46:3–11 (noting that Dr. de Bie is Hillrom's "chief scientist expert, ECG person"); Tr. 36:11–38:14, 84:19–24 (Bardy) (agreeing with Dr. de Bie's assessment); *id.* at 104:2–17 (LaViolette) (same).

[186] JX 632 ¶ 25 (Expert Report of Charlotte L. Kohler, submitted on behalf of Hillrom); *accord* JX 671 ¶ 2 (Rebuttal Expert Report of Adi Renbaum, agreeing with Kohler that Novitas' methodology is not as "intellectually defensible" as CMS's).

[187] *See* Defs.' Post-Trial Opening Br. at 48.

in due diligence."[188]  While Hillrom quotes *Akorn* accurately, it misses Vice Chancellor Laster's point. The seller in *Akorn* was urging the court to discount the buyer's MAE claim because the buyer knew, or should have known, of the events giving rise to the MAE through its due diligence. The court correctly rejected that argument.[189] The court then explained that "[t]he proper way to allocate risks in a contract is through bargaining between parties."[190]

In the very first sentences of *Chicago Bridge*, Chief Justice Strine wrote on behalf of our Supreme Court: "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract. That is true in all commercial contexts, but especially so when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business."[191] That language is unequivocal. Here, it demands that the Agreement's

---

[188] *Akorn*, 2018 WL 4719347, at *60.

[189] *See id.* (rejecting a general MAE clause regime that would result in widespread "ex-post sifting of what the buyer learned or could have learned in due diligence").

[190] *Id.* (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006)).

[191] *Chi. Bridge*, 166 A.3d at 913–14; *see also GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 778 (Del. 2012) ("'In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.' The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." (quoting *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985))).

MAE provision should not be read, as Hillrom suggests, in isolation. Rather, the Court must situate the MAE provision within the broader contractual scheme and commercial context. Like man, under Delaware law, no contractual provision is "an island, entire of itself."[192]

According to Hillrom, even if the Court chooses to consider the Agreement's risk allocation scheme, it is clear the parties did not intend to allocate the risk of a Medicare reimbursement rate reduction because neither party perceived there to be any such risk. Hillrom emphasizes that none of the MAE's carve-outs "include *any language whatsoever* mentioning reimbursement rates," making it "fantastical to believe that these sophisticated parties intended to carve out significant changes in reimbursement rates from the Company MAE definition."[193]

The preponderance of the evidence supports Hillrom's contention that, at the time of signing, neither party viewed the risk of a Medicare price shift comparable to the January Novitas Rate as substantial. A January 11, 2021 presentation to Hillrom's Board seeking approval of the Agreement listed seven "key risks," and

---

[192] *See* John Donne, *Devotions Upon Emergent Occasions*, Meditation XVII 575 (Henry Alford ed., 1839) (1624) ("No man is an island, entire of itself; every man is a piece of the continent, a part of the main; if a clod be washed away by the sea, Europe is the less, as well as if a promontory were, as well as if a manor of thy friend's or of thine own were; any man's death diminishes me, because I am involved in mankind, and therefore never send to know for whom the bell tolls; it tolls for thee.").

[193] Defs.' Post-Trial Opening Br. at 2 (emphasis in original).

lower reimbursement rates was not among them.[194] Witnesses on both sides testified to their shock and dismay at Novitas' sudden, dramatic shift in reimbursement rate pricing.[195] The parties' surprise makes sense given that Novitas had for eight years priced the CAM patch's CPT codes consistently at around $365 in the relevant regions. That does not mean, however, that these sophisticated parties decided to ignore entirely the risk of a Medicare rate adjustment in the Agreement. In this regard, Hillrom's story that "no one ever *contemplated* a rate decrease" simply does not square with the preponderance of the evidence.[196]

Hillrom had no fewer than five internal and external advisors reviewing reimbursement issues,[197] some of whom warned that, because Novitas was the highest-priced MAC contractor, "[p]rojections built off one or two outlier payors [including Novitas] are a huge red flag" and may be subject to material change.[198]

---

[194] JX 365 at 17.

[195] (Burke) Dep. 154:10 (testifying that the January Novitas Rate was "unfathomable"); Tr. 68:7–10 (Bardy) (stating he was in "disbelief" over Novitas' sudden rate shift); JX 412 at 1 (then-Bardy CEO Kevin Hykes reacting with a single word: "Stunning"); Tr. 492:21 (Frank) (stating the January Novitas Rate "was a shock"); *id.* at 566:21 (Groetelaars) ("I was really shocked.").

[196] Defs.' Post-Trial Opening Br. at 3 (emphasis added).

[197] Tr. 531:20–532:3 (Frank); *id.* at 581:12–18 (Groetelaars) (agreeing Hillrom "had the advice of outside experts and consultants to understand the various mechanics and the decision dates that were to occur around reimbursement"); JX 392; JX 434.

[198] JX 197 at 1–2 (advising Hillrom that the "[Novitas reimbursement rate] is at risk in my opinion . . . ."); *see also* JX 150 at 1, 12–14 (Muller report submitted to CMS proposing

It was also no secret that the methodology by which MACs such as Novitas calculate reimbursement rates is notoriously murky, making pricing predictions less reliable.[199]  Indeed, Bardy's CFO, Mark Querry, testified credibly that he received questions from Hillrom about reimbursement during "[a]lmost . . . every interaction with the Hillrom team" throughout due diligence.[200]  And yet, Hillrom went forward with signing the Agreement even after CMS declined to set a national rate because it lacked specific device cost information—cost information to which Hillrom had access both before and after the CMS decision was announced in December 2020.[201]

---

Medicare reimbursement rates between $60 and $100 for the CAM patch's CPT codes); (Roehrich) Dep. 85:18–92:7 (acknowledging Hillrom was aware of the Muller Report and received Parr's warning concerning reimbursement rates, and further stating that Hillrom was aware other MACs paid in the range of $45 to $60, though Hillrom attributed that to low claim volume).  As noted, this was not the first such warning Hillrom received from its outside advisors.  *See* JX 51 at 109 (Health Advances identifying in May 2020 the risk that reimbursement for extended AECG could "switch[] to Category I *with a significant reduction in value (>20-30%).*" (emphasis added)); *see also* JX 165 at 11 (Health Advances report stating with respect to reimbursement changes: "Anticipate modest (~5-10%) declines in LTH revenue, but feedback is divergent on impact and exact details are still uncertain").

[199] Tr. 371:20-372:11 (Renbaum); *id.* at 634:14–636:1 (Kohler); *id.* at 241:5–22 (Querry); JX 671 at 2.

[200] Tr. 168:8–11 (Querry).

[201] *See, e.g.*, JX 391 (Hillrom DCF setting out CAM patch cost); JX 173 at 22; JX 153 (Bardy financial model provided to Hillrom); Tr. 167:23–268:7 (Querry) (describing Hillrom's diligence as requiring "a lot of discussions around the topic of reimbursement, the topic of revenue forecasting, and the topic of cost, and cost of sales in particular.").

51

Hillrom's contention that the parties ignored the risk of a reimbursement rate reduction (notwithstanding advisors' warnings) is also belied by the Agreement's plain text. Specifically, the Agreement contains an earnout provision pegged to revenue targets.[202] Under this scheme, lower Medicare reimbursement rates for the CAM patch lowers Bardy's revenue, which in turn lowers the price Hillrom would ultimately pay to Bardy stockholders under the Agreement's earnout.[203] Hillrom understood this. Indeed, upon announcement of the January Novitas Rate, Hillrom's CEO, John Groetelaars, immediately remarked internally, "Good thing our deal has a risk share element to it [through the earnout] and that our ASP is not as high . . . less downside risk."[204] Groetelaars' kneejerk reaction to the January Novitas Rate— appreciation of Hillrom's foresight in negotiating the earnout—contradicts Hillrom's argument that a material downward adjustment of the CAM patch's Medicare reimbursement rate was so beyond the pale that neither side bothered to allocate that risk beyond the MAE.[205]

---

[202] JX 376 § 1.14.

[203] *See id.*

[204] JX 418 at 1; Tr. 567:5–568:8 (Groetelaars).

[205] Hillrom's Frank testified at trial that, had Hillrom "wanted to offload risk on the Medicare purchase price" through the earnout, it "would have structured the earnout to say exactly that." Tr. 481:22–482:2 (Frank). But, as explained, the earnout's revenue-based payout *did* function to offload risk onto Bardy should the proposed Medicare rate adjustments stick. It is perfectly rational for the parties to have allocated that risk through

Of course, the fact the parties allocated the risk of a Medicare rate adjustment through an earnout provision does not mean the adjustment cannot also trigger an MAE when it comes to fruition. Thus, while Bardy's proffered "big picture" provides a more accurate depiction of the parties' contemporaneous understanding of the Agreement (and the risk allocation memorialized therein), any resolution of the MAE dispute ultimately must be grounded in the language of the contract itself.[206] To be sure, full appreciation of how the parties understood the commercial context of the Agreement, and how that informed their contract design, does lead to some understanding of why the MAE provision did not expressly address fluctuations in Medicare reimbursement rates. But, in the final analysis, "Delaware has long adhered, and continues to adhere, to the objective theory of contracts."[207] "While [our courts] have recognized that contracts should be read in full and situated in the commercial context between the parties, the background facts cannot be used

earnouts built on contingent revenue milestones; Bardy's revenue projections were dependent in significant part on Medicare's reimbursement rate. *See* JX 440 at 3 (Hillrom's internal DCF valuation after Novitas' rate change); JX 613 at 26, 28 (Bardy's projections based on lower Medicare rates).

[206] For example, the earnout would adjust Hillrom's purchase price if an event affecting Bardy only reduced its revenue to zero indefinitely, but no party can reasonably dispute the occurrence of an MAE in that event (provided, of course, that such an event was covered by the MAE's contractual language).

[207] *Solomon v. Fairway Cap., LLC*, 2019 WL 1058096, at *9 & n.89 (Del. Ch. Mar. 6, 2019) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1987)).

to alter the language chosen by the parties within the four corners of their agreement."[208]  Accordingly, "[a]s is the Delaware way, I turn to the words the parties agreed to in their contract as the best evidence of their intent."[209]

## B. The April Novitas Rate Does Not Constitute an MAE

The parties agree that, under the Agreement, Hillrom would have no obligation to close and may terminate the Agreement in the event of a Company MAE.[210]  The parties vigorously dispute, however, whether an MAE has actually occurred.

To review, the Agreement's MAE reads in relevant part:

> **"Company Material Adverse Effect"** means any fact, event, circumstance, change, effect or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on . . . the Business of the Acquired Companies, taken as a whole; provided, however, that . . . none of the following, alone or in combination, will constitute, or will be considered in determining whether there has occurred, and no event, circumstance, change, effect or condition resulting from or arising out of any of the following, alone or in combination, will constitute, a Company Material Adverse Effect: . . .

> (ii) any condition or change in economic conditions generally affecting the economy or the industries or markets in which the Acquired Companies operate (including increases in the cost of products,

---

[208] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (internal quotations and footnote omitted).

[209] *Pearl City*, 2021 WL 1099230, at *12.

[210] JX 376 §§ 2.7, 5.1(a), 5.1(c), 6.1(b).

supplies, materials or other goods purchased from third party suppliers); . . .

(v) any change in any Law (including any COVID-19 Measures and any Health Care Law) or GAAP or any interpretation thereof;

provided, that, with respect to a matter described in any of the foregoing clauses (ii)-(vii), any such fact, event, circumstance, change, effect or condition may be taken into account in determining whether or not there has been a Company Material Adverse Effect to the extent such matter has a materially disproportionate impact on the Acquired Companies as compared to other similarly situated companies operating in the same industries or locations, as applicable, as the Business.[211]

This provision, like "[t]he typical MAE clause[,] allocates general market or industry risk to the buyer, and company-specific risks to the seller."[212] "From a drafting perspective, the MAE provision accomplishes this by placing the general risk of an MAE on the seller, then using [carve-outs] to reallocate specific categories of risk to the buyer."[213] "The principal purpose of carve outs from the definition of material adverse events or changes seems to be to remove systemic or industry risk from the MA[E] condition, as well as risks that are known by both parties at the time of the agreement."[214] "A standard exclusion from the buyer's acceptance of general

---

[211] *Id.* at 88–89 (emphasis in original) (formatting added).

[212] Y. Carson Zhou, Essay, *Material Adverse Effects as Buyer–Friendly Standard*, 91 N.Y.U. L. Rev. Online 171, 173 (2016) [hereinafter Zhou, *Material Adverse Effects*].

[213] *Akorn*, 2018 WL 4719347, at *49.

[214] *Id.* at *49 n.531 (quoting Albert Choi & George Triantis, *Strategic Vagueness in Contract Design: The Case of Corporate Acquisitions*, 119 Yale L.J. 848, 867 (2010)).

market or industry risk returns the risk to the seller when the seller's business is uniquely affected."[215]

When seeking to avoid closing by invoking an MAE clause, the buyer bears the initial "burden to prove the Seller suffered an effect that was material and adverse."[216] Upon carrying that burden, the burden then shifts to the seller (or target) "to prove that the source of the effect fell within [a carve-out]."[217] If the target carries that burden, then the buyer must prove, under the operative MAE provision, that the target's "performance was disproportionate to [similarly situated companies operating in its industry], bringing the case within an exclusion" to the carve-outs.[218]

Bardy raises at the threshold a textual argument that the April Novitas Rate is not an "event" that affects the "Business" as defined in the Agreement. I take up that issue first before considering whether, in fact, an MAE "has, or would reasonably be expected to have," occurred.[219]

---

[215] *Id.* at *49.

[216] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *51 (Del. Ch. Nov. 30, 2020); *see also Snow Phipps*, 2021 WL 1714202, at *29 (explaining the party claiming an MAE "b[ears] the initial, heavy burden of proving that an event had or would reasonably be expected to have a material adverse effect on [the target]").

[217] *AB Stable*, 2020 WL 7024929, at *51; *Snow Phipps*, 2021 WL 1714202, at *29.

[218] *Akorn*, 2018 WL 4719347, at *59 n.619; JX 376 at 88–89.

[219] JX 376 at 88–89.

**1. The April Novitas Rate Was an "Event" Impacting Bardy's "Business"**

Under the Agreement, a general MAE occurs where "any fact, event, circumstance, change, effect or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on . . . the Business of the Acquired Companies."[220] In this regard, when defining the "Business," the parties stipulated that Bardy and its subsidiary:

> are collectively engaged . . . in the design, development, manufacture, production, assembly, marketing, promotion, distribution, sale, clinical use and other commercialization activities involving certain currently-marketed and in-development cardiac digital health, diagnostic, data management and remote patient monitoring devices (including ambulatory cardiac monitors), technologies and services (including independent diagnostic testing, interpretation and cardiac monitoring services).[221]

Bardy makes two arguments as to why the Novitas rate adjustments did not affect its "Business" as contemplated in the Agreement. First, it quotes then-Vice Chancellor Strine in *In re IBP, Inc. Shareholders Litigation* to argue that the Novitas rate adjustments were not "events" under the Agreement because an MAE "is best read as a backstop protecting the acquiror from the occurrence of *unknown* events," and the risk of a change in reimbursement rates was not "unknown" at the time the

---

[220] *Id.*

[221] *Id.* at 5.

parties signed the Agreement.[222]   On this point, Bardy's attempt to render the

Agreement's language dead letter by pointing in the abstract to the theoretical

underpinnings of the typical MAE regime cannot be countenanced.   With rare

exception, Delaware law requires courts to enforce contracts as written.[223]

As previously discussed, in *Akorn*, the seller argued that an event could not

qualify as an MAE because it was discoverable during diligence.[224]  Vice Chancellor

Laster expressly rejected that argument, stating:

> [the party] goes too far by transforming "unknown events" into "known
> or potentially contemplated risks." . . .  The *IBP* decision interpreted a
> broad MAE clause that did not contain lengthy lists of exceptions and
> exclusions, and then-Vice Chancellor Strine did not suggest that he was
> prescribing a standard that would govern all MAE clauses, regardless
> of what the parties specifically bargained for in the contract.[225]

---

[222] Pl.'s Post-Trial Opening Br. at 40 (quoting *In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 68 (Del. Ch. June 15, 2001) *as corrected* (Del. Ch. June 18, 2001) (emphasis added)).

[223] *See, e.g.*, *Abry P'rs V L.P. v. F & W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006) (Strine, V.C.) (holding Delaware policy will not abide by a contractual limitation of a remedy where the fraudster intentionally misrepresents a fact embodied in a contract).

[224] *Akorn*, 2018 WL 4719347, at *60.

[225] *Id.*  As Professor Robert Miller points out, then-Vice Chancellor Strine's full quote in *IBP* is better understood when placed into its proper context.  Robert T. Miller, *Material Adverse Effect Clauses and the COVID-19 Pandemic*, 7 n.30 (Univ. Iowa Coll. L. Legal Stud. Rsch. Paper, No. 2020-21, 2020) [hereinafter Miller, *COVID-19*]; *see AB Stable*, 2020 WL 7024929, at *56–57 & n.204–06 (Del. Ch. Nov. 30, 2020) (citing favorably to Professor Miller's COVID-19 article).  The full quote in *IBP* reads: "Merger contracts are heavily negotiated and cover a large number of specific risks explicitly. As a result, even where a Material Adverse Effect condition is as broadly written as the one in the Agreement, that provision is best read as a backstop protecting the acquiror from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner." *IBP*, 789 A.2d at 68.  The second sentence

58

Here, as in *Akorn*, the parties structured the MAE definition to incorporate carve-outs and exceptions to allocate risk. The parties could have written the MAE to include only "*unknown* facts, events, circumstances, changes, effects or conditions"; they did not. Instead, they chose to adopt a broadly-worded general MAE and qualify that language with a list of carve-outs.

"It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact, to suit the court's sense of equity or fairness."[226] The Agreement allows no room for Bardy's argument that an "event" under the Agreement's MAE can only be an unanticipated event. That construction, therefore, is rejected.

Second, Bardy asserts that, by confining an MAE to changes only to Bardy's "Business," the parties intended that only those events that affected the nature of

in the quote is clearly intended to be read in contrast to the first, pitting "unknown events" against "specific risks." A more precisely framed contrast with "specific risks" would be "unspecified risks or events," which is language more consistent with what then-Vice Chancellor Strine described as a "backstop" provision. Miller, *COVID-19*, at 7 n.30.

[226] *Wal–Mart Stores*, 872 A.2d at 624; *see also DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) (Strine, V.C.) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contracts."); *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (Strine, V.C.) (explaining that Delaware courts "will not distort or twist contract language" because, in doing so, "the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements").

Bardy's operations could qualify as MAEs. Unlike the agreements in leading Delaware MAE cases—which define a material adverse effect by reference to "the business, *financial condition*, or results of operations of the Company and its Subsidiaries, taken as a whole"[227]—the parties' chosen definition of Bardy's "Business" makes no reference to the Company's financial condition but instead focuses on the Company's operations. According to Bardy, because changes to reimbursement rates affect only Bardy's revenue and not its operations, those changes cannot constitute an MAE because they do not affect Bardy's "Business" as defined. Hillrom responds that the Novitas rate decreases affect the Company's "sales," "marketing," and "other commercialization activities" for ambulatory cardiac monitors and associated devices. Accordingly, says Hillrom, the rate decreases affect the Company's operations.

The term "MAE Objects" was coined to describe the "object that must be materially adversely changed in order to result in a [MAE] under the agreement."[228]

---

[227] *See AB Stable*, 2020 WL 7024929, at *62 (emphasis added); *Akorn*, 2018 WL 4719347, at *56 (same); *Hexion*, 965 A.2d at 737 (same); *see also Snow Phipps*, 2021 WL 1714202, at *28 (MAE definition included "the financial condition, business, properties or results of operations of the Group Companies, taken as a whole."); *IBP*, 789 A.2d at 65 (MAE definition included "the condition (financial or otherwise), business, assets, liabilities or results of operations of [IBP] and [its] Subsidiaries taken as whole.").

[228] Robert T. Miller, *Canceling the Deal: Two Models of Material Adverse Change Clauses in Business Combination Agreements*, 31 Cardozo L. Rev. 99, 115 (2009); *see also AB Stable*, 2020 WL 7024929, at *62 & n.128–30 (recognizing Miller's "MAE Objects"

This list is carefully crafted by the deal parties,[229] and in this case, the MAE Objects identified in the Agreement apparently differ from those most frequently found in agreements containing MAE clauses.[230] As a matter of contract construction, the Court must respect the parties' bargain by giving meaning to the precise words they have chosen for their agreement.[231] With that said, there are some commonly employed MAE Objects that simply cannot be construed in isolation; for example, it is difficult to conceive how a negative "result of operations, assets, or liabilities" could not affect the separate MAE Object concerning an "adverse change in financial condition."[232]

---

term as "useful" and concluding the MAE definition's omission of the term "prospects" was "generally favorable to the seller.").

[229] *See Snow Phipps*, 2021 WL 1714202, at *28 n.370 (citing Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[9] (2020 ed.)).

[230] *See* Miller, *Canceling the Deal*, 31 Cardozo L. Rev. at 116 (documenting the frequency with which MAE Objects appear in a sample of contract MAE definitions). Based on Miller's sample, the terms that most frequently appear, in order, are "business," "financial condition," "results of operations," "assets," "liabilities," "properties," "condition (other than financial)," "operations" and "prospects"; none of those terms appear in the Agreement's definition of Business. *Id.*

[231] *Solomon*, 2019 WL 1058096, at *9.

[232] *See* Miller, *Canceling the Deal*, 31 Cardozo L. Rev. at 116; *see also Hexion*, 965 A .2d at 741 ("It is a maxim of contract law that . . . a contract should be read so as not to render any term meaningless."); *Pasternak v. Glazer*, 1996 WL 549960, at *3 (Del. Ch. Sept. 24, 1996) ("An interpretation of a contract that renders one or more terms redundant is not preferred over a construction that gives effect to each of the agreement's terms."); *but see U.S. West, Inc. v. Time Warner Inc.*, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996)

In this case, it is not reasonable to construe the definition of "Business," and its identified MAE Objects, so narrowly that it would remove a sudden and dramatic decrease in what Bardy can charge for its services from the reach of the Agreement's MAE clause. Per the Agreement, the "Business" is "collectively engaged" in the enumerated MAE Objects, including "commercialization activities." "Engage" is defined in Black's Law Dictionary to mean "to employ or involve oneself; to take part in; to embark on."[233] A vernacular definition of "commercialize" is "to manage on a business basis for profit; to develop commerce in; to exploit for profit; to debase in quality for more profit."[234] Bardy's "engage[ment]" in "commercialization activities," then, is dependent in part on its revenue and its profit margin on CAM patch sales. The Novitas rate decrease, therefore, affects the Company's "Business" under a plain reading of that term's definition.

---

("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.").

[233] *Engage*, Black's Law Dictionary (11th ed.); *accord Engage*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/engage (last visited June 22, 2021) ("to become involved, or have contact, with someone or something").

[234] *Commercialization*, Merriam-Webster, https://www.merriam-webster.com/dictionary/commercialization (last visited June 22, 2021); *accord Commercialization*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/commercialization (last visited June 22, 2021) ("the organization of something in a way intended to make a profit").

This reading is supported by other provisions of the Agreement. Specifically, the Agreement carves out from an "event" otherwise qualifying as an MAE:

> the failure of the Company to meet any estimate of revenues, earnings or other financial projections, performance measures or operating statistics (provided that the facts and circumstances underlying any such failure not otherwise excluded from this definition of Company Material Adverse Effect will be considered in determining whether there has occurred a Company Material Adverse Effect) . . . .[235]

This carve-out would be superfluous had the parties intended to exclude any non-operations related events affecting Bardy's defined "Business" from the general MAE in the first instance, contrary to principles of contract construction well-settled under Delaware law.[236] Placed in proper context, then, Bardy's proposed construction of "Business" is unreasonable.

\*\*\*\*\*

Having determined the Novitas rate decrease was an "event" affecting Bardy's "Business," the question remains whether the rate decrease was also an MAE under the Agreement. I endeavor to answer that question next.

---

[235] JX 376 at 88; *see also* Robert T. Miller, *What Do Exceptions in MAE Definitions Except?*, BUS. L. TODAY (May 20, 2021) https://businesslawtoday.org/2021/05/what-do-exceptions-in-mae-definitions-except/#_ftnref3 (cautioning courts to interpret MAE exceptions by reference to the actual MAE event, as opposed to the knock-on effects of those events).

[236] *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").

## 2. The Novitas Rate Decrease Was Not an MAE

Under the Agreement's MAE provision, Hillrom's burden was to prove that the Novitas rate decrease was a "fact, event, circumstance, change, effect or condition that . . . has had, or would reasonably be expected to have a material adverse effect" on the Business.[237] "There is no 'bright-line test' for evaluating whether an event has caused a material adverse effect."[238] Rather, "[t]o assess whether a financial decline has had or would reasonably be expected to have a sufficiently material effect, this court will look to 'whether there has been an adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period.'"[239]

Absent evidence to the contrary, "a corporate acquirer may be assumed to be purchasing the target as part of a long-term strategy."[240] Because neither party attempted to proffer contrary evidence here, a "material adverse effect" under the Agreement must be understood from "the longer-term perspective of a reasonable

---

[237] JX 376 at 88.

[238] *Snow Phipps*, 2021 WL 1714202, at \*30 (quoting *Channel Medsystems v. Boston Scientific Corp.*, 2019 WL 6896462, at \*34 (Del. Ch. Dec. 18, 2019)).

[239] *Akorn*, 2018 WL 4718347, at \*52 (quoting *Hexion*, 965 A.2d at 738).

[240] *Hexion*, 965 A.2d at 738.

acquiror."[241] To prove the materiality of the April Novitas Rate, therefore, Hillrom was obliged to prove that the event "substantially threaten[s] the overall earnings potential of the target in a durationally-significant manner," as opposed to causing only a "short-term hiccup in earnings."[242]

Distilled to *prima facie* elements, in order to prevail on its claim that it was excused from closing by the occurrence of an MAE, Hillrom was obliged to prove by a preponderance of the evidence that (1) the April Novitas Rate's effect on Bardy's "earnings potential," at the time Hillrom invoked the MAE clause, would "reasonably be expected" to constitute an MAE; and (2) the April Novitas Rate, at the time Hillrom invoked the MAE clause, would "reasonably be expected" to endure for a "durationally significant" period. Given that the MAE in this case is a government-set price, Hillrom's burden on the second element was to prove that it *reasonably* expected neither Novitas nor CMS would readjust Medicare reimbursement rates for the relevant CPT codes any time soon.[243]

---

[241] *IBP*, 789 A.2d at 68; *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *34 (Del. Ch. Apr. 29, 2005); *Hexion*, 965 A.2d at 738; *Akorn*, 2018 WL 4719347, at *53; *Channel Medsystems*, 2019 WL 6896462, at *34.

[242] *IBP*, 789 A.2d at 68; *Channel Medsystems*, 2019 WL 6896462, at *24; *Akorn*, 2018 WL 4719347, at *53.

[243] By necessity, the party seeking to prove an MAE has occurred must convince the court (by a preponderance of evidence) to see the future the way it sees the future in order to demonstrate durational significance. Not an easy task . . . ever. As explained below, when future outcomes rest in the hands of unpredictable actors, the burden to prove durational

For the sake of advancing the analysis, I will assume that Hillrom has proven the April Novitas Rate (as the current prevailing rate) would reasonably be expected to have a material adverse effect on Bardy at the time it refused to close the Merger.[244] Even with that ground ceded, Hillrom failed credibly to advance its claim of durational significance because the preponderance of the evidence does not

significance becomes nearly insurmountable. Such is the state of the evidentiary record confronting Hillrom.

[244] I note that both parties submitted expert evidence regarding the impact of the April Novitas Rate on Bardy's value. Both expert analyses were flawed. Hillrom's expert, Lucy Allen, did not create her own valuation model but instead worked off Hillrom's internal models to arrive at a discounted cash flow ("DCF") valuation of Bardy at less than zero. JX 631. Even assuming DCF is the proper methodology to value a startup like Bardy (a point the parties dispute), Allen's conclusion that Bardy is worth less than nothing is incredible on its face. The evidence of record uniformly shows the CAM patch is an exceptional, patent-protected product. *See* JX 204 at 3 (Hillrom's Dr. Johannes de Bie, remarking that "I have little doubt that the [Bardy] solution (CAM+IDTF) is currently the clinically best solution for [extended AECG] for the diagnosis of infrequent arrhythmias and that it is not easy to copy."); Tr. 36:11–38:14, 84:19–24 (Bardy) (agreeing with Dr. de Bie's assessment). And Bardy employee, Querry, testified credibly that the CAM patch continues to have profitable unit economics for Medicare patients. Tr. 189:12–21 (Querry). In the shadow of this testimony, as is often the case when one swings for the fences, Allen failed to make contact altogether. Bardy's expert, William Jeffers, included in his valuation expected synergies resulting from the Merger when, under the MAE's plain language, the target should be valued as a standalone entity. *See* JX 376 at 88 (defining an MAE by asking whether it "would reasonably be expected to have a material adverse effect on . . . the Business *of the Acquired Companies*, taken as a whole," as opposed to the combined company. (emphasis added)); *see also Akorn*, 2018 WL 4719347, at *56 (examining substantively identical language and concluding that "the plain language of the definition of an MAE makes clear that any MAE must be evaluated on a standalone basis"); Tr. 406:9–16 (Jeffers) (admitting that he had "not analyzed whether [the] rates have had or would have a material impact on Bardy as a stand-alone business."). By expanding his focus beyond the target, Jeffers, like Allen, failed to deliver useful evidence.

66

support the contention that neither Novitas nor CMS will increase the April Novitas Rate within a commercially reasonable period.

### a. Hillrom Failed to Prove the April Novitas Rate Will Endure for a Commercially Reasonable Period

As noted, to establish an MAE's durational significance, the party invoking the MAE clause must prove by a preponderance of the evidence that the target suffered a material adverse effect for a "commercially reasonable period," as judged from the perspective of a "reasonable acquiror."[245] Our courts have observed that "one would expect [a] commercially reasonable period to be measured in years rather than months."[246] While that general guidance is useful, our courts have stopped short of prescribing specific time periods when assessing "durational significance," and for good reason. Like most matters of law that exist in the realm of "reasonableness," the determination of what is a "commercially reasonable period" is contextual and necessarily fact intensive. It will turn on the target company's unique characteristics and the broader business dynamics in which the target operates.

---

[245] *IBP*, 789 A.2d at 68.

[246] *Frontier Oil*, 2005 WL 1039027, at *34; *Hexion*, 965 A.2d at 738; *Akorn*, 2018 WL 4719347, at *53; *Channel Medsystems*, 2019 WL 6896462, at *25.

When Hillrom acquired Bardy, it understood the Company to be a startup in a medical device segment where rapid growth was prioritized over profits.[247] Indeed, prior to any reimbursement rate change by Novitas, Hillrom's internal projections uniformly estimated Bardy would not likely turn a profit before FY 2023.[248] While a decrease in reimbursement rates means slimmer margins and an increased burn rate, Hillrom does not argue that a meaningful rate reversion back to historic (or near historic) levels by FY 2023 would constitute an MAE from the perspective of a reasonable acquiror.[249] Instead, Hillrom rests its durational significance argument on two factual predicates: (1) the new reimbursement rate will not be revisited by Novitas or CMS until 2026, at the earliest, and (2) even if the rate

---

[247] JX 110 at 4 (8/31/2020 Hillrom investment memorandum on Bardy highlighting "High Growth Segment" in the "What We Like" column, while flagging in the "What We Don't Like" column "Financial profile – High growth top line with significant losses through 2021").

[248] JX 365 at 19; Tr. 490:13–22 (Frank); (McClanahan) Dep. 50:3-23 ("Q. Do you recall seeing any models of an acquisition of Bardy by Hill-Rom where the year 1 or 10 year zero return was positive? A. Not that I recall. Q. Approximately how many different models of a potential acquisition of Bardy by Hill-Rom did you look at over the entire course of the M&A 15 process? A. Quite a few. I can't recall a specific number, though. . . . Q. More than 20; is that a fair estimate? A. That could be."); JX 108; JX 123; JX 157 at 3, 17–23; JX 173 at 19–24.

[249] *See* Defs.' Opening Br. at 45 (arguing that an MAE would occur if the rate were to rebound to $250 in two years); *see also* JX 665 ¶ 29 (Hillrom expert rebuttal report modeling a CY 2023 rate adjustment up to $300 to support her conclusion that an MAE had occurred).

were to be revised before then, there is no evidence it would be restored to historic levels.[250]

Using Hillrom as a proxy for a "reasonable acquiror," its own internal models did not project Bardy to be profitable until FY 2023.[251] In other words, Hillrom was prepared to own and operate the Company for three years without returns. It has also acknowledged that five or more years is "durationally significant."[252] With these markers in mind, it is reasonable to peg a two-year lag (conservatively) between the April Novitas Rate and a revised reimbursement rate to historic (or near historic) rates as a commercially reasonable period, meaning that Bardy can operate under the April Novitas Rate for two years without suffering an MAE.[253]

The question remains whether there is evidence that either Novitas or CMS will revise the April Novitas Rate within the next two years. On this point, both

---

[250] Hillrom maintains that Bardy is on the brink of insolvency and will need to secure new financing by August or September 2021. Defs.' Post-Trial Opening Br. at 39. But Bardy has always relied on outside cash infusions to operate given its status as a growth company that is not cash-flow positive. The record indicates that Bardy continues to grow and have access to capital, as evidenced by its recently completed $15 million debt financing. Tr. 203:1–207:16 (Querry).

[251] JX 365 at 19; Tr. 490:13–22 (Frank).

[252] *See* Defs.' Post-Trial Opening Br. at 39–45; Defs.' Post-Trial Reply Br. at 1, 19.

[253] This conclusion is further buttressed by Bardy's continued growth notwithstanding the lowered Medicare reimbursement rates. *See* Tr. 190:23–192:8–15, 195:14–19, 197:1–12 (Querry) (describing Bardy's growth post-April Novitas Rate); JX 702 at 3–5 (Bardy's Q1 2021 financial update).

parties retained experts offering diametrically opposed views regarding the durability of the April Novitas Rate. Hillrom's expert, Charlotte Kohler, opined that CMS would not establish a national fee schedule for the CAM patch's CPT codes anytime soon.[254] She further opined that Novitas is unlikely to revisit, much less materially increase, its rate decisions any time "within the foreseeable future."[255] Even if either CMS or Novitas were to intervene sooner, Kohler says, the rates would not meaningfully change.[256]

Kohler's testimony was not persuasive on several fronts. First, Kohler admits she has no firsthand experience with CMS rulemaking.[257] Rather, her background is in consulting on various unrelated healthcare-related matters, including reimbursement compliance.[258] The practical implications of her lack of relevant experience were on full display when she stated definitively in her initial report that

---

[254] JX 632 ¶ 15. According to Kohler, CMS will not deviate from its preset rate schedule at least until the RUC meets again in October 2024 to consider pricing. *See* Tr. 668:23–24 (Kohler) (opining that CMS would not "see any burning need to go outside the normal process"); *id.* at 347:6–23 (Renbaum) (noting that the RUC is scheduled to review the relevant CPT codes in October 2024).

[255] JX 632 ¶ 15; Tr. 623:11–17, 668:17–24 (Kohler).

[256] JX 632 ¶ 15.

[257] Tr. 623:11–17, 668:17–24 (Kohler).

[258] *See* JX 640; JX 632 ¶¶ 1–8.

Novitas would not adjust the January Novitas Rate only to be told months later that Novitas did just that when it announced the upwardly-adjusted April Novitas Rate.[259]

Second, Kohler's testimony that CMS would see no "burning need" for a rate revision sits in tension with Hillrom's proffered justification for refusing to close the Merger, namely that the April Novitas Rate has cast Bardy into an existential crisis.[260] While the potential ruin of only one socially valuable company may not provide sufficient impetus to spur CMS into action, the impact of the rate increase was felt throughout the LTH cardiac monitoring industry. Indeed, iRhythm, an indisputably comparable market participant, initially announced that it would no longer serve Medicare patients in reaction to the April Novitas Rate before reversing that decision during trial.[261] iRhythm's stock price has fallen by 68% since the January Novitas Rate was first announced.[262] The parties do not dispute that LTH

---

[259] *See* JX 632 ¶¶ 15, 62 (Kohler stating she believed it unlikely Novitas would take further action after the January Novitas Rate and that CMS would ultimately price reimbursement for the CAM patch's CPT code at approximately $60).

[260] *See* Defs.' Post-Trial Opening Br. at 69 ("[T]he April Novitas Rate caused Bardy's value to drop into the *negative*. That means that it would be economically irrational to continue operating the business, such that the transaction would make little sense." (emphasis in original)).

[261] JX 646 at 5, 9.

[262] JX 631 ¶ 35. Hillrom argues that the further drop in iRhythm's stock price following the announcement of the April Novitas Rate indicates the market's belief that the April Novitas Rate will have a significant, long-term effect on iRhythm's business. Defs.' Post-Trial Opening Br. at 38. That may be true, but reimbursement rates are

is a rapidly growing healthcare category holding significant promise for patients—something CMS cares deeply about.[263] And LTHs "are not commodities where they are all the same"; device differences can "lead to false diagnoses or inadequate diagnoses and miscategorize heart rhythm disorders," creating "a large public health problem, [that is] [] costly as well."[264] The preponderance of the record evidence thus demonstrates that there is an urgent need for a revision of the April Novitas Rate. That Kohler refused to acknowledge, much less meaningfully account for, this need diminished her credibility.

Finally, Kohler admits that Novitas allows no visibility into its rate-setting process and that it follows "no rules" as it determines when and at what amounts to set reimbursement rates.[265] Yet this did not stop Kohler from stating rather

---

undeniably driven in significant part by proprietary information concerning the cost of certain inputs to extended AECG devices. Public markets have little insight into those costs and are reacting to a price set by a MAC with notoriously opaque pricing methodologies that, judging by the quickly revised January Novitas Rate, are also prone to error. That the parties agreed expert testimony on this topic was justified is further indication that repricing analysis is complex and technical. Taken together, these considerations lead me to place little weight on the market's sentiment on future Medicare reimbursement rate adjustments as measured by fluctuations in iRhythm's stock price.

[263] JX 335 at 12; Tr. 522:2–5 (Frank) (acknowledging that extended AECG is a high-growth category); *id.* at 313:17–314:15 (Renbaum).

[264] Tr. 22:16–23:18 (Bardy).

[265] *Id.* at 622:21–623:21, 634:14–635:16 (Kohler); *see also* JX 632 ¶ 25 (Kohler stating in her report that "[t]he processes by which the MACs determine pricing are comparatively less transparent than the process used by CMS. The MACs do not publish proposed rates and invite public comment, for example. There are also no published rules for how often

72

definitively that Novitas would not revisit the April Novitas Rate any time soon.[266] The lack of meaningful factual foundation for this bodement makes it no more useful than a Zoltar-told fortune.

Bardy's expert, Adi Renbaum, opined that Novitas or CMS will likely revisit setting a national reimbursement rate during the upcoming 2021 rulemaking cycle and, at the latest, by 2023.[267] In contrast to Kohler, Renbaum's opinion was informed by her extensive experience engaging with both CMS and the MACs on health policy and pricing new codes.[268] She correctly predicted the January Novitas Rates would be revised in short order after they were announced.[269] And she predicts now that the April Novitas Rate will be revised again (if not by Novitas, then by CMS) for three principal reasons.[270]

First, CMS's decision to "crosswalk" a price of $400+ and subsequently delegate to the MACs temporary pricing authority pending submission of further

---

- if ever - MACs must review the pricing they have set . . . . For these reasons, the price set by any one MAC may not be as intellectually defensible from a valuation perspective as the rates set by CMS ").

[266] JX 632 ¶ 15; Tr. 623:11–17, 668:17–24 (Kohler).

[267] JX 635 at 3.

[268] *See* Tr. 293:24–298:15, 315:10–316:12 (Renbaum); JX 635 ¶¶ 5–8 (detailing Renbaum's experience).

[269] Tr. 299:11–17 (Renbaum).

[270] *See id.* at 300:5–301:4 (Renbaum).

information signals that CMS will take up the issue again soon.[271]  In this regard, Renbaum found significant that, in its final rule, CMS stated it had deferred its pricing decision "for 2021," indicating that CMS would defer for that year only.[272]

Second, Renbaum opines that it is unlikely CMS will ignore the "significant" number of Medicare claims for this service.[273]  As noted, under CMS's "triple aim," its decision-making process is guided by: (1) the health of each individual patient; (2) the health of the population, including managing healthcare disparities and other problems; and (3) costs.[274]  With these "aims" in mind, CMS is focused on facilitating patient access to new, promising therapies and diagnostic modalities.[275] As already discussed, the preponderance of the evidence demonstrates that the April Novitas Rate has threatened patient access to LTH devices like the CAM patch

---

[271] *Id.* at 307:13–308:17 (Renbaum) (explaining CMS's decision to cross-walk makes "clear they're continuing to gather more data to come to a final decision.  And so this is an interim . . . decision they made . . . . [T]hey're working on this, and they're going to work on it until it's resolved.").

[272] *Id.* at 309:6–310:10, 311:20–312:8 (Renbaum); JX 350 at 3.

[273] Tr. 300:3–18 (Renbaum) ("I believe in 2018, the Medicare claims volume was over about 150,000 for the year of utilization of this service, which is significant.  And so it's on Medicare's radar to address, and that's part of why the CPT codes were created in the first place.").

[274] *Id.* at 313:19–23 (Renbaum).

[275] *Id.* at 313:7–13 (Renbaum).

74

by challenging the commercial viability of devices in that category.[276] Given the dynamic growth in demand for LTH devices, Renbaum believes "this is not something [CMS] can take [its] eye off and just say we'll deal with it . . . in the future sometime. This is something that's in front of [CMS], and I expect that they're going to be discussing it in the [next] proposed rule."[277]

Third, and relatedly, the April Novitas Rate has received considerable attention, not only from affected industry players but also from clinicians who are concerned about their ability to continue to provide this service to patients in need.[278] iRhythm, for example, has stated publicly that the April Novitas Rate remains "below [its] cost to deliver the service" and it is continuing a "multi-pronged approach to activating the specialty physician societies, including the AMA, the ACC and HRS, our individual physician customers and patients to directly engage decision-making authorities in the clinical importance of long-term continuous ECG

---

[276] *See* JX 646 at 5, 9 (iRhythm CEO stating after announcement of the April Novitas Rate: "Now that the rates that have been posted are as low as they are, obviously, we're not going to be able to serve in that segment."); *but see* JX 823 at 5–6 (iRhythm announcing it would reenter the Medicare market, though it was continuing to engage with Novitas and believed its pricing model for the service flawed). I note that iRhythm's reentry into the market after its prior announcement that it could not serve Medicare patients at the April Novitas Rate could be interpreted to mean iRhythm is confident prices will be revised upwards soon.

[277] Tr. 314:7–15 (Renbaum).

[278] *Id.* at 300:5–301:4, 312:9–313:11 (Renbaum).

monitoring."[279] Renbaum believes that public pressure, combined with the category's increasing importance to patients, makes it likely that the current MAC rates will not endure.

Renbaum's testimony was credible and her conclusion—that either CMS or Novitas will intervene within two years to course-correct the CAM patch's reimbursement rate—is reasonable. While Hillrom argues Novitas is unlikely to change the April Novitas Rate because, in the past, it has maintained its pricing decisions for extended periods, recent history proves Novitas is both agile and susceptible to mispricing CPT codes. Indeed, Novitas' recently erratic pricing behavior "is indicative of the nuances in the evolution of payment policy; it is not a static process and has flexibility to change when warranted."[280] In unprecedented times, history makes for a poor guide. Novitas' recently erratic pricing behavior thus limits the utility of its historical pricing habits when predicting whether it will re-revise its rates.

---

[279] JX 646 at 5–6.

[280] JX 671 ¶¶ 4–5. The April Novitas Rate was even further removed from the RUC's pricing recommendation to CMS of $440. *See* JX 70 at 2; Tr. 307:2–10 (Renbaum). Another methodology employed to estimate the extended ECG's supply price yielded a value of $416.85, while a series of invoices submitted by stakeholders suggested a price of $595. JX 70 at 2.

Hillrom also makes much of the fact that the April Novitas Rate was the product of a considered, months-long process with industry input.[281] According to Hillrom, Novitas' announcement of the April Novitas Rate after it gathered data and input from the industry means the CAM patch's new pricing is the new normal.

To be sure, the April Novitas Rate is the disappointing end-result of a full court press by LTH device makers. One witness even testified that the meetings with Novitas that occurred between the January Novitas Rate and the April Novitas Rate were Bardy's "one shot" to persuade the MAC to raise its rates.[282] But that sentiment came in the midst of crisis: by all accounts, the January Novitas Rate was clearly a "mistake" that drastically underpriced extended AECG monitors.[283] That mistake made the need for a pricing readjustment urgent and Novitas responded quickly. But its "black box" decision-making process makes it extremely difficult to predict what next steps are probable. Given this dynamic, it is just as likely as not that Novitas' decision to more-than-double prices with the April Novitas Rate was simply a band-aid to stop the bleeding as it further considers how properly to price

---

[281] Defs.' Post-Trial Opening Br. at 42–43.

[282] (Hykes) Dep. 253:11–15.

[283] Tr. 177:15–178:14 (Querry); *id.* at 492:18–493:11 (Frank); *id.* at 566:19–567:2 (Groetelaars).

the relevant CPT codes.[284]   Indeed, Novitas continues to engage with industry participants, including iRhythm, to discuss the appropriate pricing for extended AECG devices.[285]   If Novitas believed it had already considered all relevant evidence and had made a final, informed decision, then there would be no reason for it to continue engaging in these discussions.

Hillrom has likewise failed to carry its burden to prove that CMS will not intervene in the near future.  In August 2020, CMS indicated that the reimbursement rate for extended AECGs like the CAM patch would increase to between $400

---

[284] *See* JX 823 at 4 (iRhythm CEO stating on Q1 2021 earnings call that "[t]hrough our conversations [with Novitas], we have learned that Novitas used a valuation methodology based on assumed cost inputs.  Unlike our experience with NICE in the UK or with our commercial payers in the UK, [as] well with our commercial payers, the overall impact on health care costs was not directly considered in this analysis."); *see also* JX 632 ¶ 25 (Hillrom expert explaining that the MAC pricing process was "not [] as intellectually defensible from a valuation perspective as the rates set by CMS.").

[285] JX 823 at 3, 5–6 ("Since Novitas published updated rates on April 10 this year, we have had discussions with them to better understand their analysis and to propose an alternative costing method.  The model we have shared with them has been successfully applied in other areas of the CMS physician fee schedule and we believe is a more appropriate methodology for establishing rates for the long-term continuous ECG Category I codes. Novitas has been open to discussing this approach."); Tr. 832:17–833:5 (Noether) (iRhythm said it was pursuing "three different mechanisms to attempt to secure higher reimbursement for the LHM").

and $465.[286]  Sophisticated industry players, including Hillrom, believed that outcome to be reasonable—even likely—and counted on its occurrence.[287]

In a surprise move, CMS delegated its pricing authority to the MACs on an interim basis as CMS collected more data.  Hillrom does not dispute (indeed, its lawsuit is premised on the fact) that the April Novitas Rate's significant departure from Novitas' historical reimbursement rates has created turbulence in a growing market serving an increasing number of patients.  Though Hillrom channels its expert to argue CMS will not act without a RUC recommendation (not scheduled to occur before October 2024), it argues in the next breath that Bardy and the industry have been decimated by the change in reimbursement rates.[288]  Its position simply does not square with evidence of the extended AECGs' rapid segment growth and CMS's public health mission; indeed, the entire reason CMS considered moving extended AECGs' CPT codes into Category I is *because it viewed these devices as offering important diagnostic support for its beneficiaries.*[289]  In the face of CMS's

---

[286] PTO ¶ 28; JX 93 at 8.

[287] *See* JX 195 at 2.  Both parties assumed in their models the ~$464 national rate, and had to revise those assumptions once CMS declined to adopt its proposed fee schedule. Tr. 172:4–23 (Querry); JX 254 at 38; Tr. 489:4–10 (Frank); JX 365 at 19.

[288] *See* Defs.' Post-Trial Opening Br. at 33–40.

[289] JX 635 at 5–9 (explaining why a CPT code would move from Category III to Category I); Tr. 300:5–18 (Renbaum) (same).

well-documented "triple aim," and Renbaum's credible testimony on how that agency operates, Hillrom has failed to carry its burden to prove that it reasonably expected CMS would not prioritize the CAM patch's CPT codes and revisit the April Novitas Rate within the next two years.

Having found that the preponderance of the evidence does not support Hillrom's contention that neither CMS nor Novitas will revisit the April Novitas Rate within a commercially reasonable period, the question remains whether these regulators are likely to revise the reimbursement rate meaningfully upward such that an MAE would not reasonably be expected to have occurred. Hillrom says no; Bardy says yes and, more to the point, Bardy says Hillrom has not proven otherwise. Here again, Bardy has the better of the evidence.

### b. Hillrom Failed to Prove the April Novitas Rate Will Not Be Meaningfully Revised Upwards

Hillrom asserts that CMS pricing is dictated by cost of goods sold.[290] CMS deferred setting a national price because it did not have adequate information on the direct cost of the CAM patch itself.[291] Because Bardy can turn a profit at the

---

[290] Defs.' Post-Trial Opening Br. at 40–41.

[291] PTO ¶ 28; JX 350 at 3.

April Novitas Rate, Hillrom reasons syllogistically that the CAM patch's unit economics confirm that the April Novitas Rate is here to stay.[292]

Hillrom's cynicism regarding the regulators' inclination to revisit and increase the April Novitas Rate is striking when set against its position prior to the announcement of the January Novitas Rate—informed by Hillrom's extensive diligence on reimbursement rates and knowledge of the CAM patch's cost structure—that a downward revision to the historic reimbursement rate was unlikely and unjustifiable.[293] Though Novitas' black box methodology makes its pricing decisions difficult to predict, CMS's pricing methodology was then, and is now, relatively transparent.[294] Neither party argues there has been any change in how CMS prices a device and, as a sophisticated healthcare operator with a team of experts dedicated to analyzing reimbursement risks, Hillrom well understands the way in which CMS determines the price of a device.[295]

---

[292] *See* Defs.' Post-Trial Opening Br. at 43; Defs.' Post-Trial Reply Br. at 1 (citing Tr. 657:13–658:1 (Kohler)).

[293] *See* JX 141 at 2 (stating Hillrom has "an entire workstream dedicated to [investigating] reimbursement for [Bardy]"); JX 391 (including CAM patch margins in Hillrom DCF); JX 170 (Groetelaars agreeing there is "little merit to the argument" iRhythm's AECG "should be valued solely based on direct inputs").

[294] *See* JX 632 ¶¶ 25, 31–36; JX 635 ¶ 30.

[295] *See* JX 110 at 5 (listing as a point "requir[ing] validation" that "[r]eimbursement rate changes for [extended AECG] announced in August of 2020 are not meaningfully impacted through the 'comment period' and are stable in 2021 and beyond"); *see also* Tr. 168:8–11

Based on its "extensive, disciplined" diligence,[296] Hillrom decided that the rationale justifying the CAM patch's then-current pricing was sound.[297] For example, Hillrom stated internally in October 2020 that the extended AECG device:

> is a service and a device and must therefore be reimbursed as a complete package. Using CMS' own words, the organization develops [relative pricing for CPT codes] by "considering the direct and indirect practice resources involved in furnishing each service," with (a) direct expenses including things like clinical labor, medical supplies, and equipment, and (b) indirect expenses covering items like labor and office expenses.[298]

(Querry) (confirming that there were questions about reimbursement during "[a]lmost . . . every interaction with the Hillrom team"). As noted, Hillrom's team included outside advisors. Tr. 527:18–528:19, 533:7–12 (Frank); *id.* at 581:12–582:9, 600:5–601:1 (Groetelaars); JX 169; JX 197; JX 246 (reiterating Parr's view that "CMS is sometimes hesitant about new categories if not enough invoices were submitted or [sic] from a broad group of suppliers, as they do not want the few invoices presented to CMS to be for a list price and then find out later that discounts are being offered in the market and they are 'overpaying'").

[296] (Blanchard) Dep. 164:12-16; *see also* Tr. 167:23–168:11 (Querry) (describing Hillrom's extensive diligence process).

[297] It is undisputed that all sides saw no justification for reimbursement rates below $365, and were shocked upon announcement of the January Novitas Rate. Tr. 50:4–17, 67:24–68:3 (Bardy) (seeing little risk in December 2020 that reimbursement rates would decrease in 2021, and expressing shock at Novitas' price revision); JX 253 (Bardy presentation to Hillrom days after CMS announced its final fee schedule stating "[w]e do not expect MAC rates to decline, nor do most analysts."); JX 218 at 1; JX 365 at 17 (January presentation to Hillrom's board not identifying reimbursement as among "key risks"); *see also* Tr. 566:21 (Groetelaars) (expressing surprise at the January Novitas Rate); *id.* at 492:21 (Frank) (same); *id. at* 139:3–140:4 (LaViolette) (same); *id.* at 264:9–12 (Burke) (same); JX 412 at 1 (then-Bardy CEO Kevin Hykes reacting to the news with a single word: "Stunning").

[298] JX 170 at 2–3.

Hillrom's CEO, Groetelaars, agreed with this assessment, stating, "[i]t is highly unusual for reimbursement to change materially from [CMS's] proposal to [CMS's] final [rate]. I'm not even aware of an instance where a significant change has occurred in the past."[299] Hillrom's pre-litigation characterization of CMS pricing as more holistic jibes with Renbaum's credible testimony that CMS accounts in its pricing for such things as "health outcomes of the different services."[300]

Now in litigation, Hillrom disclaims that view, contending that CMS's proposed rate is irrelevant and the April Novitas Rate has reset future pricing expectations indefinitely. That argument runs contrary to CMS's indisputably "iterative" rate-setting process, which builds on (rather than abandons) past analyses.[301] There is no reason to believe that Novitas' cryptic process, which evidently yields mistaken outcomes, would meaningfully affect CMS's independent review of the relevant CPT codes. And while Novitas' historically stable $365 rate was somewhat of an outlier among other MACs, that did not prevent CMS from

---

[299] *Id.* at 1.

[300] Tr. 344:23–345:1 (Renbaum). I note that Hillrom did not address whether the costs for research and development of a product (as opposed to simply costs of goods sold) factor into CMS's assessment.

[301] JX 671 ¶ 11; Tr. 312:11–24 (Renbaum).

"crosswalking" a rate significantly higher than even Novitas' rate in its proposed rule.[302]

In sum, Hillrom assessed the case for a $400+ reimbursement rate on a CAM patch to be strong pre-signing, and it offers no reason to believe the ground supporting that case has shifted in the interim. The only change to which Hillrom points is the April Novitas Rate. But the way in which Novitas arrived at that rate is unclear; it revised the rate once in dramatic fashion and continues to engage in conversations concerning flaws in its pricing methodology.[303] Nothing about Bardy's fundamental business or the strength of its technology has changed. Indeed, it continues to grow apace notwithstanding the challenges brought on by the April Novitas Rate and this litigation.[304] After careful consideration, I am satisfied the

---

[302] *See* JX 197. Though some advisors warned Hillrom that the CAM patch's CPT codes may be revised significantly downwards, the preponderance of the evidence supports Hillrom's assessment that these reports were "outliers" and the rationale for higher, historical prices were sound. Tr. 529:1–19 (Frank) (viewing Muller Report as outlier); (Roehrich) Dep. 85:18–92:7 (discussing JX 197, Hillrom's team was "generally interested" in Parr's opinion but concluded any pricing change would be "modest"); JX 251 at 3 (12/4/2020 Bardy presentation to Hillrom expressing that it did not expect MAC rates to decline, a view shared by most analysts); Tr. 479:2–13 (Frank) (agreeing that Hillrom did not anticipate a dramatic pricing change).

[303] *See* JX 823 at 3, 5–6; Tr. 832:17–833:5 (Noether).

[304] Tr. 190:23–191:23, 202:7–203:5 (Querry); JX 702 at 3–5 (Bardy Q1 2021 update showing continued growth in enrollments and unit orders).

record supports the assumptions underlying Bardy's *pro forma* model calculating the clinical value of its service to justify the historic $365 Novitas rate or above.[305]

Returning to Hillrom's burden, it is insufficient to show the effect of the April Novitas Rate *might* be durationally significant, as "a mere risk of an MAE cannot be enough."[306] Because Hillrom has failed to prove that it reasonably would have expected that CMS would not meaningfully increase the current Medicare reimbursement rates for the relevant CPT codes, it has likewise failed to prove that the current state of those rates constitutes an MAE.

*****

For reasons explained, Hillrom has failed to carry its burden to prove that an event had or would reasonably be expected to have an effect sufficiently material and adverse to qualify as an MAE at the time it refused to close the Merger. The analysis, therefore, could end here. For the sake of completeness, however, I take up the remaining links of the analytical chain and conclude that they too require a Plaintiff's verdict.

---

[305] *See* Tr. 186:5–188:3 (Querry) (explaining *pro forma* model calculating value of the clinical service as a stand-in); JX 498.

[306] *Akorn*, 2018 WL 4719347, at *65; *see also Snow Phipps*, 2021 WL 1714202, at *30 (same).

### 3. The April Novitas Rate is a "Health Care Law" Carved Out From an MAE

Per the Agreement, "any change in any Law (including . . . any Health Care Law) . . . or any interpretation thereof" cannot, alone or in combination, constitute an MAE.[307] The Agreement defines "Law" as "any" regulation or rule issued by "any" Governmental Body, including "any authorized contractor engaged by any governmental, legislative, executive or judicial agency . . . or regulatory body."[308] This exception squarely encompasses changes in the Medicare reimbursement rates set by Novitas.[309]

CMS is a federal agency within the federal Department of Health and Human Services—a cabinet-level executive branch agency. Among CMS's regulatory functions is the issuing of Physician Fee Schedules and other payment regulations.[310] These responsibilities are prescribed by federal statute and clearly listed under the "Regulations and Policies" section of the CMS website.[311] Medical device suppliers

---

[307] JX 376 at 88–89.

[308] *Id.* at 95, 98.

[309] To reiterate, Bardy bears the burden of proving this exception applies by a preponderance of the evidence. *See AB Stable*, 2020 WL 7024929, at *51.

[310] Pl.'s Post-Trial Opening Br. at 52

[311] 42 U.S.C. §1395w–4(b)(1); Medicare Fee-For Service Payment Regulations (2018), https://www.cms.gov/regulations-and-guidance/regulations-and-policies/medicare-fee-for-service-payment-regulations (last visited June 4, 2021).

like Bardy are obligated to adhere to these rates; failure to do so is referred to as "balance billing" or "surprise billing" and is generally forbidden under federal law for Medicare-participating providers and suppliers.[312]   The parties do not meaningfully disagree that any schedule of fees set by CMS that governs payments to doctors or other suppliers for Medicare services, while colloquially referred to as "rates" or "prices," are regulations or rules as contemplated by the Agreement.[313]

Here, the Medicare reimbursement rates in question are not presently set directly by CMS.  Rather, they are determined by Novitas in its capacity as a MAC, which operates as CMS's authorized contractor (hence the moniker "Medicare Administrative Contractor").[314]  Hillrom correctly highlights that the Social Security Act considers the promulgation of fee schedules by the Secretary of the Department of Health and Human Services as "regulation[s]," but it is mistaken in assuming that this classification is limited to situations where CMS itself sets the rate.

---

[312] 42 U.S.C. § 1395cc(a)(1)(A).

[313] Tr. 310:16–311:8 (Renbaum); *id.* at 668:6–16 (Kohler); *id.* at 169:6–170:1 (Querry).

[314] 42 U.S.C.A. §1395kk-1 (granting authority to MACs for payment functions, including the "[d]etermination of payment amounts"); *Patwardhan v. United States*, 2014 WL 1093049, at *1 (C.D. Cal. Mar. 18, 2014) ("CMS delegates certain functions to its [MACs], including determining the amount of the payments to be made to provide[r]s as required by the Medicare statute.").

CMS regularly delegates the setting of reimbursement rates, among other functions, to MACs.[315] Indeed, Hillrom acknowledges that CMS has never set a national rate for the CPT codes applicable to the CAM patch; Novitas has always determined the amount to be paid to Bardy in the regions where it operates.[316] Bardy could not ignore MAC pricing or seek to negotiate higher reimbursement rates from Medicare any more or less than it could ignore or negotiate CMS pricing; the price is the price.[317] As an "authorized contractor engaged by" CMS, Novitas acts unilaterally on behalf of, and with the full authority vested in, CMS.[318] Because reimbursement rates are regulations when set by CMS, it follows that the rates set by MACs, as CMS's "authorized contractors,"[319] must also be classified as such. Accordingly, Bardy has proven that Novitas' reimbursement rate revisions in

---

[315] *See* Tr. 310:16–311:8 (Renbaum).

[316] Defs.' Post-Trial Opening Br. at 17.

[317] Tr. 311:9–12 (Renbaum).

[318] 42 U.S.C. §1395w–4(b)(1) (requiring Fee Schedules to be established "by regulation"); JX 349 (CMS Decision in Federal Register); Tr. 310:16–311:8 (Renbaum); *see also* 42 U.S.C.A. §1395kk-1 (granting authority to MACs for payment functions, including the "[d]etermination of payment amounts"); *Patwardhan*, 2014 WL 1093049, at *1 (describing the nature of CMS's delegation authority vis-à-vis MACs).

[319] JX 376 at 88–89.

January and April 2021 fall under the Agreement's MAE exception for changes of Law.[320]

### 4. The April Novitas Rate Did Not Have a "Disproportionate Impact" on Bardy

Even if an event otherwise constituting an MAE is contractually carved out by the parties, the Agreement provides that any such event may nevertheless qualify as an MAE "to the extent such matter has a materially disproportionate impact on [Bardy] as compared to other similarly situated companies operating in the same industries or locations, as applicable, as [Bardy]."[321] Hillrom bears the burden to prove that the April Novitas Rate had a "materially disproportionate impact" on Bardy.[322]

Thinking, again, in terms of *prima facie* elements, in order to prove that the "materially disproportionate impact" exception applies, Hillrom was obliged to

---

[320] I note that Bardy also has a strong argument under another carve-out to the MAE, namely that a Company MAE cannot be based on an event "generally affecting the economy or the industries or markets in which [Bardy] operate[s]." JX 378 at 89. On its face, a change to the Medicare reimbursement rate for a particular CPT code would appear not to discriminate against any particular company, but rather would cut across the "market" for extended AECG devices. The parties, of course, dispute how broadly (or narrowly) the "market" should be defined. I need not adjudicate this dispute in this context, however, as I have concluded that the change-in-Law carve-out, without an applicable exception, defeats Hillrom's MAE claim.

[321] Pl.'s Post-Trial Opening Br. at 38.

[322] PTO ¶ 91; *IBP*, 789 A.2d at 68.

prove (1) the universe of "similarly situated" companies "operating in the same industries or locations" as Bardy, and (2) that Bardy, as compared to those businesses "similarly situated," suffered a "materially disproportionate impact" from the April Novitas Rate. I address each element in turn.

### a. iRhythm is the Only Company "Similarly Situated" to Bardy

The MAE clause limits the universe of companies by which to assess the proportionality of an event's impact to "similarly situated companies operating in the same industries or locations . . . ."[323] This language differs from language interpreted in other Delaware MAE cases, where the carve-out exceptions contemplated disproportionate impact on "comparable entities operating in the [same] industry . . . ."[324] Here again, well-settled canons of contract interpretation require that the Court give effect to every word in the contract in order to avoid "surplusage."[325] The additional qualifier—"similarly situated"—bounds the

---

[323] JX 376 at 89 (providing that exclusions can be "taken into account" only "to the *extent that such matter* has a *materially disproportionate impact* on [Bardy] as compared to other *similarly situated* companies operating in the same industries or locations, as applicable, as [Bardy]" (emphasis added)).

[324] *Snow Phipps*, 2021 WL 1714202, at \*35; *see also Akorn*, 2018 WL 4719347, at \*51 (construing disproportionate impact exception that provided: "to the extent such effect, change, event or occurrence has a disproportionate adverse affect [sic] on the Company and its Subsidiaries, taken as a whole, as compared to other participants in the industry in which the Company and its Subsidiaries operate . . . .").

[325] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at \*4 (Del. Ch. June 21, 2012).

universe of such companies to a subset "operating in the same industries or locations." Thus, I must determine what makes a company "similarly situated" before turning to whether Bardy was "disproportionately impacted" by the April Novitas Rate as compared to others in "the same industries."

Hillrom argues that a company is "similarly situated" if it competes with Bardy for the same customers in the ambulatory cardiology market.[326] It identified two potential groups as "similarly situated" to Bardy: leading ambulatory cardiology players (i.e., iRhythm, BioTelemetry and Preventice) and a larger set of purportedly peer companies comprising other clinical diagnostic providers with more limited share.[327] Bardy counters that a company is "similarly situated" only if it is a "close comparator" to the Company, which, by Bardy's lights, leaves only iRhythm.[328]

The Agreement does not provide any criteria by which to assess whether a company is "similarly situated" to Bardy. Of course, the similarity of a company's

---

[326] Defs.' Post-Trial Opening Br. at 61.

[327] *Id.* I note that Hillrom urges the Court to follow the approach taken in *Akorn* to identify "similarly situated companies," but fails to acknowledge that the provision at issue in *Akorn* used substantively broader language to define the universe of comparators. *See Akorn*, 2018 WL 4719347, at *51, *58 (reviewing an MAE disproportionate-impact exclusion where the universe of comparators was defined as "other participants in the industry in which [the seller] operate[s]").

[328] Pl.'s Post-Trial Opening Br. at 56.

91

situation is factually relative by design; under a plain reading of the MAE exception, the words "similarly situated" reference company characteristics related to the "matter" the exception is addressing.[329]  In my view, because the rate changes at issue affect specific categories of products in the ambulatory cardiology monitoring market, a comparator company's relevant characteristics include operational scale (i.e., revenue), developmental maturity and, most importantly, product portfolio (i.e., relative product mix and sophistication).[330]

Neither party disputes that iRhythm is "similarly situated" for purposes of interpreting the disproportionate impact exception.[331]  I agree.  iRhythm is the only other market player that, like Bardy, derives the vast majority of its revenue from a single product—its LTH device (the Zio XT patch).[332]  Further, like Bardy, iRhythm has yet to turn a profit, signaling it also currently prioritizes growth over profitability.[333]  While iRhythm is publicly traded, Bardy maintains healthy access

---

[329] JX 376 at 89.

[330] *See Genesco, Inc. v. The Finish Line, Inc.*, 2007 WL 4698244 (Tenn. Ch. Dec. 27, 2007) (holding that inclusion of "similarly situated" language should prompt the court to consider issues of relative product mix in deciding which companies were similarly situated).

[331] *See* Pl.'s Post-Trial Opening Br. at 56; Defs.' Post-Trial Reply Br. at 3, 28.

[332] JX 631 at 39–40 (estimating iRhythm derives 96% of its revenue from its patch product); Defs.' Post-Trial Reply Br. at 30.  While it also sells MCOT services, these account for a negligible portion of its current revenue.

[333] Tr. 204:8–205:13 (Querry); *id.* at 442:22–24 (Jeffers).

to capital to fuel its expansion.[334] The only substantive distinction between iRhythm and Bardy is operational scale: iRhythm's revenue is more than nine times greater than Bardy's.[335] Even still, iRhythm's product mix has left it similarly dependent on (and affected by) the April Novitas Rate.[336]

BioTelemetry and Preventice, by contrast, rely predominantly on MCOT devices for their revenue, with only 9% and 15% of their annual revenue coming from LTH devices, respectively.[337] What LTH devices they do sell, they source from third parties.[338]

Where the "matter" or "event" alleged to be an MAE is a change in a specific product's Medicare reimbursement rates tied to particular products and related services, product mix is patently the most important factor in determining a comparator firm's "situational" position relative to Bardy.[339] Preventice's

---

[334] Tr. 203:22–207:16 (Querry).

[335] Defs.' Post-Trial Reply Br. at 30.

[336] *See* JX 665 ¶ 10 (showing iRhythm stock price dropping by 68% since January following announcement of the April Novitas Rate).

[337] *Id.* at 48; JX 636 ¶ 64.

[338] JX 636 at 5–6.

[339] Hillrom implicitly recognizes this when it used *only* iRhythm's revenue multiples to value Bardy. JX 365 at 20; *see also* (McClanahan) Dep. 98:14–99:6 (noting that Hillrom specifically looked at iRhythm's growth rates and margin projections when assessing the future value of Bardy).

significantly lesser reliance on LTH relative to Bardy and iRhythm (15% compared to 100% and 96%, respectively) weighs heavily against finding that Preventice is "similarly situated."[340] The same holds true for BioTelemetry.[341]

Hillrom proffers the composition of the consortium loosely formed to advocate for a revision of the January Novitas rate—BioTelemetry, Preventice, Bardy and iRhythm—as evidence of companies "similarly situated." In the same vein, Hillrom points to its pre-litigation Board documents to show that it considered BioTelemetry and Preventice as competitive with Bardy and iRhythm at the time of the Merger.[342]

But Hillrom's arguments show merely that each of these companies compete for customers and have a shared interest in getting paid as much as the market will bear for their products and services.[343] The Agreement's MAE clause, however, did not delimit the reach of its "disproportionate impact" exception to companies

---

[340] Hillrom also maintains that Preventice is more like Bardy than iRhythm because it is privately-held with revenue numbers closer to iRhythm than Bardy. Defs.' Post-Trial Opening Br. at 30. But Preventice's revenue drivers are fundamentally different, and the company operates at break-even, indicating its exposure to fluctuations in LTH Medicare rates is limited based not only on its product mix but also on its stage of corporate maturation.

[341] *See* JX 636 ¶ 64 (noting that LTH comprises ~10% of BioTelemetry sales); JX 665 at 48 (same).

[342] Defs.' Post-Trial Opening Br. at 29–30.

[343] JX 665 (showing BioTelemetry and Preventice trace between 9% to 15% of their revenue from LT-ECG and are thus market players with skin in the game).

operating in the same "market." Rather, it required an assessment of whether the impact caused by "such matter" was "materially disproportionate" relative to "similarly situated companies operating in the same industries."[344] In my view, that language calls for a more granular parsing of a company's situation than mere participation in the LTH market.

Indeed, the market assessments highlighted by Hillrom demonstrate how Bardy differed from BioTelemetry and Preventice in salient ways, including its reputation as a best-in-class "pure player" that fields only LTH technology, its relative financial immaturity and its small size.[345] Companies seeking to make a strategic acquisition within a market inevitably survey multiple potential targets, each of which often bring meaningfully different qualities and synergies to the table. That Hillrom also assessed the potential of other players with marginal skin in the LTH game does not render them "similarly situated" as contemplated by the Agreement's exception to the MAE carve-outs.

I acknowledge that, at first glance, there might appear to be circularity in a reading of "similarly situated" that limits the disproportionate impact exception to companies that share a similar product mix with the target and, therefore, might be

---

[344] JX 376 at 88–89.

[345] JX 51 at 24 (presentation to Hillrom's board describing Bardy as having a "[b]est in class device").

expected to suffer similar impacts from external events affecting the featured product(s). That figment disappears, however, after more careful observation. As a one-product company that operates in a high-growth, heavily regulated market, it is not surprising that Bardy bargained for a narrower, more target-friendly exclusion to the MAE carve-outs.[346]

\*\*\*\*\*

Having determined that iRhythm is the only "similarly situated" company operating in the same industry as Bardy, I next consider whether it was disproportionately impacted by the April Novitas Rate relative to iRhythm.

### b. Bardy Was Not "Disproportionately Impacted" By the April Novitas Rate

As noted, a carved-out event may nevertheless qualify as an MAE "to the extent such matter has a materially disproportionate impact" on Bardy.[347] Before turning to the evidence on this point, I pause to parse two aspects of the parties'

---

[346] *Chi. Bridge*, 166 A.3d at 926–27 (holding that, to understand a contract, "[t]he basic business relationship between [the] parties" be considered so that the court may "give sensible life" to the Agreement). I note that one could easily envision a scenario where iRhythm and Bardy were impacted very differently by the April Novitas Rate, even though both are heavily reliant upon their offerings in the LTH space. For instance, if iRhythm had elected to focus its sales on providers who treat only patients insured by commercial carriers, or to filter its mix so that a greater percentage of revenue was derived from higher paying commercial carriers, the impact on Bardy relative to iRhythm would likely be disproportional.

[347] JX 376 at 88–89.

chosen contractual phrasing. First, the Agreement provides that the carve-out's exception applies "*to the extent*" "such matter" impacts the target disproportionately. That language, plainly read, indicates that Bardy only agreed to assume the risk of an event where the *delta* of its impact on the target's business, as compared to others "similarly situated," is, itself, material. For example, if the risk "adversely affects all [similarly situated] companies operating in the seller's industry, but the average adverse effect is only a 10% diminution in cashflows while the seller's cashflows are reduced by 50%, then the question will become whether a 50% - 10% = 40% reduction in cashflows constitutes a Material Adverse Effect on the company."[348]

Second, the Court must understand what the parties intended by the term "impact." The proportionality of an event's "impact" could be understood by measuring its effect on the target relative to other comparables delimited in the MAE. Under that company-specific reading, the "impact" of the April Novitas Rate would be measured holistically by analyzing how the April Novitas Rate affected Bardy's business vis-à-vis iRhythm. Alternatively, "impact" could be understood by reference to the *event itself*, requiring an analysis of whether the event's effect in absolute terms discriminated against the target as compared to others "similarly situated." From that frame, the April Novitas Rate would "impact" all companies

---

[348] Miller, *COVID-19*, at 5–6; *see also AB Stable*, 2020 WL 7024929, at *56–57 & n.204–06 (citing favorably to Miller's COVID-19 article).

the same as an across-the-board cut to reimbursement rates; in other words, the reduction in the reimbursement rate could not, by definition, be "disproportionate" because all companies selling covered devices would experience an identical drop in revenue per unit.

While the latter reading of "impact" has some intuitive appeal given its congruence with the broader theory of MAEs as mechanisms to shift market risk onto the buyer and individual risk onto the seller,[349] it does not comport with other provisions in the Agreement.[350] Specifically, the Agreement carves out from its definition of MAE events "generally affecting the economy or the industries or markets in which [Bardy] operate[s]."[351] If the parties intended "impact" to be measured by the absolute effect of the event itself, then the carve-out for broad market events would be redundant (as, by definition, events "generally affecting" the "markets" would "impact" all players equally). Thus, while the Agreement could have more clearly defined "impact," when reading the Agreement holistically, "impact" must be measured by reference to an event's relative, overall effect on

---

[349] *Akorn*, 2018 WL 4719347, at *49 ("The typical MAE clause allocates general market or industry risk to the buyer, and company-specific risks to the seller." (quoting Zhou, *Material Adverse Effects*, at 173)).

[350] *See GMG Cap. Invs.*, 36 A.3d at 779 ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.").

[351] JX 376 at 89.

other companies. Under this reading, even though the April Novitas Rate applies equally to all companies selling LTH devices under the relevant CPT codes, its "impact" is "disproportionate" only where one company's suffering is outsized compared to "other similarly situated companies operating in the same industries or locations" as Bardy.

Not surprisingly, the parties disagree about which financial metric should serve as the defining benchmark for the analysis. Bardy focuses on revenue and volume of sales, which it contends are the most relevant factors to a growth-oriented company like Bardy and formed the bases for Hillrom's determination that Bardy was an attractive acquisition target.[352] Hillrom emphasizes profitability and discounted cash flows ("DCF"), which it argues are standard benchmarks in any acquisition and metrics that figured prominently in Hillrom's pre-acquisition due diligence of Bardy.[353]

This court has noted that it is appropriate to consider whether a material adverse effect has occurred broadly by reference to "the overall earnings potential of the target."[354] Previous decisions have coalesced around EBITDA as the primary (but by no means exclusive) financial metric by which to measure the operational

---

[352] *See* Pl.'s Post-Trial Opening Br. at 46, 58–59; Pl.'s Post-Trial Reply Br. at 32.

[353] *See* Defs.' Post-Trial Reply Br. at 13–18.

[354] *IBP*, 789 A.2d at 68.

results of the business.[355]   EBITDA, of course, measures a company's free cash flows.[356]   And free cash flows, as the source for calculating a firm's value through a DCF analysis, is regarded by many as the "gold standard" valuation metric.[357]   That metric operates with less force, however, when the target is still in startup mode and, like its "similarly situated" comparator, is unprofitable and invested heavily in growth.[358]

I need not delve further into the most appropriate benchmark(s) by which to measure the "operational results of [Bardy's] business,"[359] however, because Hillrom has failed to prove that Bardy suffered a disproportionate impact relative to

---

[355] *See id.* at 66–67 (reviewing the target's financial performance by reference to earnings per share and EBIT); *Hexion*, 965 A.2d at 740 (determining EBITDA "is a better measure of the operational results of the business" than earnings per share); *Akorn*, 2018 WL 4719347, at *53–57, *62 (placing the most weight on EBITDA, while also considering other metrics including revenues, operating income and earnings per share).

[356] *See Hexion*, 965 A.2d at 740.

[357] *See In re PetSmart, Inc.*, 2017 WL 2303599, at *23 (Del. Ch. May 26, 2017) (compiling authority).

[358] *See* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 17–18 (Wiley, 3d ed. 2012) ("Discounted cash flow valuation is based on expected future cash flows and discount rates.   Given these estimation requirements, this approach is easiest to use for assets (firms) whose cash flows are currently positive and can be estimated with some reliability for future periods, and where a proxy for risk that can be used to obtain discount rates is available."); *id.* (observing that DCF valuations often do not properly account for unutilized assets or patents.).   As noted, iRhythm, the "similarly situated" comparator, is also unprofitable and currently oriented toward growth.

[359] *Hexion*, 965 A.2d at 740.

iRhythm by any measure. Because of their comparable product mixes and the nearly mirrored percentage of revenue attributable to Medicare reimbursements, one would expect iRhythm and Bardy to be similarly impacted by the April Novitas Rate in terms of revenues, gross profits and other valuation metrics. And the numbers bear this out.

The April Novitas Rate's impact on revenue is clearly not disproportional. Bardy and iRhythm attribute 29% and 27% of their revenue to Medicare reimbursements, respectively.[360] Hillrom's own expert models show Bardy's revenue impact at either -22% or -63%, depending on whether an impact to non-Medicare payors is included in the calculation.[361] The corresponding figures for iRhythm deviate by only a few percentage points, at -16% and -60%, respectively.[362]

---

[360] JX 668 ¶ 58. I note that Hillrom's expert, Allen, misstated the proportion of revenue Bardy derives from Medicare. *See* JX 631 (Allen calculating Bardy's portion of revenues attributable to Medicare to be 36%). Medicare represented approximately 33% of Bardy's total units sold in 2020, and its weighted revenue accounted for 44.6% of split bill revenues. *See* JX 259 ("Phasing Analysis" sheet setting out Bardy's payor mix). Hillrom's DCF model included split bill revenues accounting for approximately 65.9% of total Bardy revenues for CY 2020. JX 391 ("US Patch Build" sheet setting out Bardy's revenue distribution). 44.6% of Split Bill x 65.9% = ~29% of revenues reimbursed by Medicare. Though Bardy's expert advanced this argument in his rebuttal report, Hillrom never meaningfully contests his point on brief or otherwise.

[361] JX 665 at 49–50.

[362] *Id.*

The April Novitas Rate's impact is not disproportional when measured by profitability either. Hillrom bears the burden of proof here, and yet Bardy and iRhythm's gross margins are difficult to discern from the parties' competing expert analyses. Specifically, it is unclear how iRhythm treats its costs when calculating its gross margin, and whether its treatment is comparable to Bardy's.[363] It is, therefore, difficult to assess whether the experts' granular analysis is actually comparing apples to apples.[364] On a less granular level, the record indicates Bardy has competitive, or even superior, margins to iRhythm, as iRhythm's first reaction to the April Novitas Rate was to announce that it could no longer profitably serve

---

[363] *See* JX 668 ¶ 68 (observing that "[c]ompanies calculate their cost of sales on a different basis from one another and include or exclude certain expenses and costs that are not always obvious. These inclusions and exclusions are not clearly defined in their financial statements. It is particularly more complex to determine cost of sales basis for these companies, as they have high technology and services components, so costs and expenses related to labor, compensation, and research and development may or may not be partially or fully included in cost of sales, according to an individual company's accounting practices.").

[364] Bardy's expert, Jeffers, could not say for sure whether his gross margins calculations included device costs "beyond just the plastic patch and adhesive tape." Tr. 425:21–426:17 (Jeffers). He further assumed iRhythm's gross margins for its Medicare business were the same as its overall gross margins, without support for that assumption. *Id.* at 426:23–427:11, 420:12–431:4 (Jeffers). Hillrom's expert, Allen, based her gross margin numbers for iRhythm on public disclosures, but it is unclear whether those numbers are calculated in the same way as Bardy's numbers. *See* JX 631 ¶ 68; *see also* JX 668 ¶¶ 67–68 (Jeffers persuasively critiquing Allen's methods).

Medicare patients.[365] While iRhythm subsequently reconsidered its decision to exit the Medicare market segment,[366] Bardy has never doubted its ability to operate profitably under the April Novitas Rate.[367] This makes sense since, notwithstanding iRhythm's superior economies of scale as a larger company, Bardy runs most of its Medicare claims through IDTFs in New Jersey, where the rates are about 15% higher than in Houston, where iRhythm has its IDTFs.[368] Again, while differences in the competing products' profit margins are difficult to discern on this record, the evidence indicates they are a far cry from the 10x deltas held in *Akorn* to constitute a disproportionate impact.[369]

Finally, on the issue of valuation, Hillrom argues Bardy's DCF valuation has "dropped over 100%" to "less than $0," while iRhythm's stock price declined only 68%.[370] As noted above, however, Allen's valuation of Bardy as worth less than the

---

[365] JX 646 at 5; *see also* (McClanahan) Dep. 98:14–99:6 (noting that Hillrom specifically looked at iRhythm's growth rates and margin expectation when it assessed the future value of Bardy).

[366] JX 823 at 3.

[367] Tr. 189:1–190:12 (Querry) (confirming Bardy continues to operate profitably and suggesting iRhythm's wavering on serving Medicare patients presented an opportunity to take increase Bardy's market share).

[368] *Id.* at 188:5–24 (Querry); JX 668 ¶ 70; JX 589 at 11.

[369] *Akorn*, 2018 WL 4719347, at *58–60.

[370] Defs.' Post-Trial Opening Br. at 7, 66.

paper on which the Agreement was printed is facially incredible given the value of Bardy's intellectual property, its growth trajectory and its profitable unit economics. Moreover, juxtaposing Hillrom's DCF valuation with iRhythm's publicly-traded stock price compares apples to oranges—you can do it, but the result yields very different flavors on the palate.[371]

Hillrom failed to carry its burden to prove that the disproportionate-effect exception applies to disable the applicable MAE carve-out. That carve-out, therefore, renders Hillrom's refusal to close a breach of the Agreement.

## C. The Purpose of the Agreement is Not Frustrated

Having failed to prove an MAE, Hillrom is left to fall back on its argument that its obligation to close is excused because the purpose of the Merger has been frustrated. The frustration of purpose doctrine discharges a contracting party's obligations when his "principal purpose is substantially frustrated without his fault by the occurrence of any event the non-occurrence of which was a basic assumption

---

[371] *See Hexion*, 965 A.2d at 734 (noting differences between both sides' experts' DCF analyses and their public company/transaction analysis amounting to $6 billion and $700 million, respectively). As previously noted, iRhythm's fluctuations in market value have been driven largely by popular guesses on whether the April Novitas Rate is here to stay; because this is a highly technical subject with evidence on record indicating the April Novitas Rate will not endure for a durationally significant period, I reiterate that iRhythm's stock price, on this record, is not a reliable indicator of its estimated value. *See* JX 665 ¶ 10 (documenting correlation between iRhythm's stock price and the timing of Novitas' rate announcements).

on which the contract was made."[372] "This common law doctrine provides an escape for an acquirer if the target experiences a catastrophe during the executory period."[373] "It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract."[374]

The purpose of this Merger has not been frustrated. For reasons explained, Hillrom's contention that the April Novitas Rate renders Bardy less than worthless is not credible. Hillrom sought to acquire a growth company with clinically superior technology to expand its cardiology offering; Bardy remains exactly that. While the April Novitas Rate will lower Bardy's revenue in the short-term, the record does not support that this state will remain *status quo* for long. In any event, the parties allocated the risk of a reimbursement rate reduction onto Bardy through the Agreement's earnout, which helps to offset any short-term losses Hillrom will suffer as a result of the April Novitas Rate. For these reasons, Hillrom's invocation of the frustration of purpose doctrine fails.

---

[372] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006) (quoting Restatement (Second) of Contracts § 265 (1981)).

[373] *Akorn*, 2018 WL 4719347, at *57.

[374] Restatement (Second) of Contracts § 265 cmt. a.

## D. Remedies

Because Hillrom has failed to prove the occurrence of an MAE, its failure to close the Merger on February 25 breached the Agreement.[375] Bardy claims it is entitled to specific performance and compensatory damages, in addition to prejudgment interest on the deal price.[376] Hillrom does not dispute that, if a breach is proven, specific performance is warranted.[377] Nor does it appear to contest Bardy's claim for prejudgment interest.[378] It does, however, contest Bardy's claim for compensatory damages.

In support of its damages claim, Bardy points to two clauses in the Agreement. First, in Section 9.11 of the Agreement, the parties agreed that specific performance

---

[375] JX 376 §§ 1.3, 5.1.

[376] Tr. 401:12–403:18 (Jeffers); JX 636 at 30–33 (Bardy's expert report calculating that Bardy suffered more than $12 million in damages from reduced transaction proceeds, a cash burn of roughly $97,000 per business day, and litigation fees and expenses); *Brinkerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 262 (Del. 2017) ("Once liability has been found, and the court's powers shift to the appropriate remedy, the Court of Chancery has broad discretion to craft a remedy to address the wrong.").

[377] *See* Defs.' Post-Trial Reply Br. at 39–40 (disputing only Bardy's prayer for damages while implicitly acknowledging its right to specific performance); *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived."); *see also* JX 376 § 9.11 (parties waiving any arguments against specific performance in the Agreement).

[378] *See* Defs.' Post-Trial Reply Br. at 39–40 (disputing only Bardy's claim for damages under the Agreement's indemnification clause); *see also Osborne ex rel. v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (affirming trial court's award of specific performance and its order that payment of delayed purchase price include interest).

was not exclusive of an award of damages.[379]  Second, in Section 7.3, the parties agreed that after closing Hillrom would:

> indemnify, defend and hold harmless the Equityholders . . . from, and will reimburse the Equityholder Indemnified Parties for, all Adverse Consequences suffered or incurred by the Equityholder Indemnified Parties, to the extent arising out of or related to a breach or non-fulfillment by Parent or Merger Sub and, with respect to covenants and agreements required to be performed after Closing, the Company or Surviving Corporation, of any of their respective covenants or agreements in this Agreement.[380]

"Adverse Consequence" is defined to include any "expense, loss, liability, Tax or other damages" and "reasonable and out-of-pocket legal and other professional fees, costs, [and] other dispute resolution expenses[.]"[381]  Bardy asserts that, because it will not be made whole by specific performance alone, an award of damages—in addition to pre-judgment interest on amounts that should have been paid at the scheduled closing on February 25—are warranted in this case.

Hillrom responds that the term "Equityholder" is defined to mean "a holder of Company Capital Stock, Company Options, Company Warrants or Promised Option Units."[382]  According to Hillrom, that definition does not include Bardy.

---

[379] JX 376 § 9.11.

[380] *Id.* § 7.3.

[381] *Id.* at 81.

[382] *Id.* at 93.

Indeed, Bardy does not claim any Equityholder was harmed, but instead argues that "Hillrom has damaged *Bardy*" and that "*Bardy* suffered more than $12 million in damages."[383]

I agree with Hillrom. Section 7.3 clearly juxtaposes the "Equityholder Indemnified Parties" with "the Company [Bardy] or Surviving Corporation": on the one hand, the Equityholder Indemnified Parties will be reimbursed "to the extent arising out of or related to a breach or non-fulfillment by [Hillrom]" pre-closing; on the other hand, "with respect to covenants and agreements required to be performed *after* Closing," Hillrom would reimburse "the Company [Bardy] or Surviving Corporation."[384] By distinguishing Equityholder Indemnified Parties from Bardy, and spelling out that the latter would only be reimbursed "with respect to covenants and agreements required to be performed after Closing," the parties unambiguously excluded Bardy from indemnification for any pre-closing breaches by Hillrom, including its refusal to consummate the Merger.

While Bardy handwaves the Court in the direction of the supposed legion authority supporting its proposition that, notwithstanding a plain reading of the Agreement's text, Bardy qualifies as an Equityholder under the Agreement, it

---

[383] Pl.'s Post-Trial Opening Br. at 65 (emphasis added).

[384] JX 376 § 7.3 (emphasis added). Bardy acknowledges on brief that Section 7.3's "breach or non-fulfilment" language means "a pre-closing breach." Pl.'s Post-Trial Opening Br. at 65 n.299.

conspicuously fails to cite any authority stating as much.[385]  At oral argument, Bardy raised for the first time "the *We Work* case from last year" as an instance where this court allowed a company to stand in the stockholders' shoes for purposes of pursuing damages.[386]

I gather Bardy is referring to this court's December 14, 2020 decision *In re WeWork Litigation*, where former-Chancellor Bouchard held The We Company ("WeWork"), a commercial real estate entity, had standing to pursue breach of contract claims against its shareholder, Softbank Group Corp. ("SBG"), under a Master Transactions Agreement ("MTA") that obligated SBG, *inter alia*, to consummate a tender offer to WeWork's shareholders.[387]  Although WeWork was not among the tendering stockholders allegedly trodden upon by SBG's cold feet, the court nonetheless held WeWork could sue on their behalf for "essentially three reasons": (1) WeWork was a party to the MTA, and the agreement expressly acknowledged that the parties were entitled to sue should the transactions contemplated therein not be consummated consistent with its terms; (2) "injury-in-fact" is not limited "to those who could show economic harm," but extends more

---

[385] *See* Pl.'s Post-Trial Opening Br. at 64–66.

[386] Post-Trial Oral Arg. at 87:23–88:3.

[387] *In re WeWork Litig.*, 2020 WL 7343021, at *1–2, *5–9 (Del. Ch. Dec. 14, 2020).  There were a number of "*We Work* decisions from last year [2020]," though this appears to be the only viable candidate to advance Bardy's position.

broadly to a company that failed to receive even the tender offer's "relatively small benefit" of reduced agency costs (from a larger stockholder on the cap table) and improved employee morale; and (3) structural barriers hardcoded into the MTA would frustrate (or at least disadvantage) stockholders seeking to enforce the reasonable efforts provision against SGB, and equity abhors a wrong without a remedy.[388]

I confess I do not follow Bardy's analogy. The MTA in *WeWork* expressly designated WeWork as a party that could sue for SBG's breach, whereas the Agreement expressly juxtaposes Bardy with the Equityholders indemnified for Hillrom's pre-closing breaches. While Bardy was no doubt harmed by a delayed closing, that does not mean *ipso jure* that it is entitled to collect damages under a contract's bargained-for indemnification scheme. An order of prejudgment interest will adequately address harm flowing from the delayed closing, and that is the only compensatory relief Bardy is entitled to receive.[389]

### III.   CONCLUSION

Hillrom has failed to carry its burden to prove that it is excused from closing on the Merger by the occurrence of an MAE since it has failed to prove the

---

[388] *Id.* at *8–9.

[389] *See Snow Phipps*, 2021 WL 1714202, at *55–56 (citing *Osborn v. Kemp*, 2009 WL 2586783, at *12 (Del. Ch. Aug. 20, 2009), *aff'd*, 991 A.2d 1153 (Del. 2010)).

April Novitas Rate will have a durationally significant material effect on Bardy. Even if Hillrom had successfully proven a durationally significant effect, a change in Medicare reimbursement rates was carved out from the MAE definition and Hillrom failed to prove that Bardy was "disproportionately impacted" relative to "similarly situated companies operating in the same industries or locations" as Bardy. The remedy for Hillrom's breach of contract is specific performance and prejudgment interest. In this regard, Bardy has failed to prove that it is entitled to compensatory damages.

For the foregoing reasons, my verdict is for Bardy on its claim for specific performance of the Agreement and prejudgment interest on the deal price at the statutory rate.[390] Hillrom's claims for relief are dismissed. Bardy's counsel shall file, on notice, a proposed form of final judgment within ten (10) days of the date of this opinion.

---

[390] 6 *Del. C.* § 2301(d).